**In re FULGHUM CONSTRUCTION CORPORATION.**

**No. 81–3040.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Sept. 18, 1981.

C. Kinian Cosner, Nashville, Tenn., for plaintiff-appellant.

Charles E. Shivel, Jr. and William L. Montague, Lexington, Ky., for defendant First Security National Bank.

John Bailey, III, Nashville, Tenn., for defendant Ranier & Associates.

David Stosberg, Louisville, Ky., for defendant Liberty National Leasing Co.

## MEMORANDUM

WISEMAN, District Judge.

This action is an appeal by the bankruptcy trustee from two judgments entered by the United States Bankruptcy Court, *In re Fulghum Construction Co.*, 7 B.R. 629 (Bkrtcy. M.D. Tenn. 1980) and *In re Fulghum Construction Co.*, No. 380–00235, Adv. Proc. No. 380–0081 (Bkrtcy. M.D. Tenn. July 14, 1980), Hon. Russell H. Hippe, Jr., presiding, dismissing the trustee's complaint in the proceeding below. Also involved in this action is an appeal by defendant Ranier & Associates from the dismissal of a counterclaim for damages filed by it against the trustee.

In this appeal the trustee argues that the Bankruptcy Court erred in its conclusions (1) that the trustee had no interest in certain equipment sold by the debtor, Fulghum Construction Company, to one of the defendants, Ranier & Associates; (2) that the corporate entity should not be disregarded and therefore that defendant Ranier & Associates—the sole shareholder of the debtor—should not be held liable for the debtor's debts; and (3) that certain payments made by the debtor to defendant Ranier & Associates were not preferential transfers under section 547(b) of the Bankruptcy Code. Ranier & Associates in turn challenges the conclusion of the Bankruptcy Court that it failed to substantiate its claim for damages that it allegedly suffered because of the trustee's retention of the above-mentioned equipment.

For the reasons stated in this opinion, the appeals of both parties are dismissed and

the judgment of the Bankruptcy Court is affirmed in all respects.

### Applicable Law

The Bankruptcy Court found that the law of Texas, the state of the debtor's incorporation, was controlling on the issues of whether the corporate veil should be pierced and whether the transfer of the equipment from the debtor to Ranier & Associates was a valid sale. This finding is not disputed, and this Court agrees that Texas law is applicable. *See* Restatement (Second) of Conflicts § 302 (1971).

### Facts

The Bankruptcy Court made the following findings of fact in the proceeding below. Because these findings are not clearly erroneous, they are adopted by this Court and herein repeated. *See* Rule 810, Rules of Bankruptcy Procedure.

1. The corporation was organized in Houston, Texas, in 1966. It was named Fulghum Engineering & Construction, Inc., for one of its organizers, James T. Fulghum, who served as the corporation's president. The name was later changed to Fulghum Construction Corporation.

2. The corporation was authorized to engage in a wide variety of heavy construction activities but at all times material hereto engaged principally in the construction of oil and natural gas pipelines. It was authorized to do business in some thirty states and Canada. At all times material hereto its principal place of business was in the vacinity [sic] of Nashville, Tennessee.

3. In October 1977, Harry H. Ranier and Neale R. Hall, residents of Kentucky, acquired all of the outstanding shares of stock in the corporation. Although Ranier and Hall became vice-presidents of the corporation, no significant changes in management were made at that time. Mr. Fulghum, who continued to serve as president, testified that it was his understanding that the new owners were going to infuse the corporation with additional capital, because substantial liquid assets were required for such companies to bid successfully on large projects.

4. The corporation lost in excess of $600,000 from its operations during 1977.

5. In the early part of 1978, Ranier formed a general partnership with a certified public accountant, Algin H. Nolan, known as Ranier & Associates. Since July of that year, when Hall transferred all of his stock to Ranier, Ranier & Associates has been the corporation's sole shareholder.

6. The shareholder expressed dissatisfaction with the management of the corporation at a meeting in April 1978. On July 15, 1978, Mr. Fulghum and another key member of the management team were discharged. Both the shareholder and the directors adopted resolutions authorizing Nolan

> to assume full and complete management and administrative responsibilities of the Corporation with full power to remove and/or replace any and all personnel thereof, to reorganize in any fashion or cease altogether any or all operations of the Corporation, including dissolutionment, as he in his sole discretion may deem necessary, proper, or expedient.

A few days later a new board of directors elected Michael J. Leatherman executive vice-president to assume responsibility for soliciting bids for the corporation and for overseeing the company's operations. These were the last significant formal actions taken by the shareholder or the directors of the corporation prior to the filing of the trustee's complaint.

7. The first steps taken by Nolan pursuant to the extraordinary powers granted him in the shareholder's and directors' resolutions occurred in September 1978. For the stated purpose of improving both the balance sheet and the liquidity of the corporation, he decided that all of the corporation's equipment should be sold to the shareholder and then be leased back to the corporation. The equipment was appraised at $1,137,350. To effect this sale and leaseback, two uncaptioned

agreements were executed by the shareholder and the corporation on or about September 20, 1978. One of the agreements recited that the shareholder as buyer had paid to the corporation as seller of the equipment the cash purchase price of $1,137,350. In the other, the shareholder purported to lease the equipment back to the corporation. The sale agreement contained no language of conveyance. Neither the shareholder nor the corporation took any formal steps to consummate the sale. No bill of sale was ever executed, and none of the documents evidencing ownership of the equipment (e. g., files maintained by the corporation on each item of equipment that included the original bill of sale and other pertinent documents) were ever transferred from the corporation to the shareholder. Several items of equipment were covered by certificates of title issued by the state of Tennessee. None of the title certificates were ever transferred to the shareholder. The corporation remained in possession of all of the equipment.

8. Although the so-called sale agreement recited that the corporation received $1,137,350 in cash, that recitation was false. The shareholder obtained a loan in the amount of $950,000 from one of the defendants, Liberty National Leasing Company (a subsidiary of Liberty National Bank), to finance the major portion of the purchase price and initially only paid this sum to the corporation. Coincidental with this transaction, Nolan transferred the corporation's principal bank accounts from a Nashville bank to one in Mt. Sterling, Kentucky, where Ranier & Associates had its office. Apparently a check in the amount of $1,137,350 was deposited in one of the corporation's newly opened accounts. On the same date, however, a check drawn on that account in the amount of the difference between the Liberty National loan and the purchase price—$185,350—was deposited in one of the shareholder's accounts. These checks apparently were paid on the same date. Thus only $950,000 was actually paid to the corporation in September 1978.

9. Nolan testified at the trial that the $185,350 was withdrawn from the corporation's account in order to safeguard it against a possible unauthorized withdrawal. He indicated that Mr. Fulghum had made such a withdrawal some months before. Mr. Fulghum, however, had been dismissed more than two months earlier. The court thus finds that Nolan's explanation of the withdrawal was patently false. It is apparent that the shareholder had no intention of paying the full cash purchase price in September 1978 but intended only to advance to the corporation the proceeds of the Liberty National loan.

10. A corporate balance sheet prepared by an accounting firm immediately after the September 1978 transaction reflected a shareholder's equity of $170,928.00. Prior to the purported sale, the equipment was carried on the corporation's books at the depreciated value of $436,258.00. Thereafter the corporation never represented in its financial records that it continued to own the equipment.

11. While the transaction resulted in an improvement in the corporation's balance sheet and liquidity, it was detrimental to the corporation in that it resulted in a significant taxable gain and necessitated the dissipation of a valuable asset—the tax loss carry-forward—to avoid payment of the substantial tax liability that resulted. The real beneficiary appears to have been the shareholder, which was able to depreciate the equipment from the new, stepped-up basis. While the loan proceeds provided the corporation with additional cash, there was no showing why the corporation itself could not have borrowed this amount of money, using the equipment as collateral as the shareholder did.

12. The shareholder granted Liberty National a security interest in the equipment to secure repayment of this loan.

13. According to a detailed analysis prepared by Nolan, a substantial number of financial transactions between the cor-

poration and the shareholder took place between June 1978 and November 1979. It was the shareholder's practice to withdraw from the corporation, as well as other corporations it owned, any cash that was not immediately required by the corporation and to return it on an as-needed basis. According to this analysis, which was never seriously questioned by the trustee, there were almost one hundred such transactions during this period of time. Initially the corporation was indebted to the shareholder, but as a result of the $187,350 credit from the equipment transaction, the shareholder became indebted to the corporation and remained so until June 1979. From that time until the corporation ceased doing business in November 1979, the corporation was indebted to the shareholder for advances made to it. The net result is that the corporation presently is indebted to the shareholder in the sum of $387,844.16. Most of the advances made by the shareholder in the latter part of 1979 were in the form of deposits to the corporation's payroll account at the Kentucky bank to ensure completion of jobs in progress.

14. Although there were a substantial number of financial transactions between the shareholder and the corporation, it appears that Nolan, who rigidly controlled the corporation's finances at least after September 1978, maintained detailed records separating the financial affairs of the partnership and the corporation.

15. In May 1979 the shareholder borrowed substantial sums of money from another of the defendants, First Security National Bank of Lexington. As part of the security therefor, Ranier & Associates granted the bank a security interest in the equipment. It is conceded by the trustee that the sums owed to both secured party defendants substantially exceed the present value of the equipment and that, if their security interests are valid, he has no interest in the equipment.

16. On January 25, 1980, an involuntary petition was filed against the corporation in this court, and an order for relief subsequently was entered.

### The Sale of the Equipment

The trustee challenges the validity of the equipment transfer from Fulghum Construction Company to Ranier & Associates on two grounds. First, the trustee argues that because of certain improprieties in the sales transaction itself, title to the equipment never passed to Ranier & Associates. Alternatively, the trustee argues that even if title passed, the sale should be set aside as fraudulent. This Court rejects both these contentions and agrees with the Bankruptcy Court that title to the equipment passed to Ranier & Associates upon full payment of the purchase price.

■ The trustee's initial argument is that title to the equipment did not pass because no formal bill of sale was ever executed and no actual transfer of the certificates of title to certain pieces of the equipment occurred. This argument must fail for the simple reason that the failure to transfer these documents does not prevent transfer of the title itself. As the Bankruptcy Court correctly ruled, the transaction in question here is governed by section 2–401(3)(b) of the Uniform Commercial Code, which provision has been adopted by all three states concerned here (Texas, Tennessee, and Kentucky). That provision states:

Each provision of this chapter with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods:

(b) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

The pertinent case law under this section demonstrates clearly that the crucial consideration in determining passage of title is not the transfer of a certificate of title but the completion of all performance intended to occur by the parties to the contract. *See Young v. Golden State Bank*, 560 P.2d 855 (Colo.App.1977); *Ace Supply, Inc. v. Rocky-Mountain Machinery Co.*, 96 Idaho 183, 525 P.2d 965 (1974); *Southwest Bank v. Moritz*, 203 Neb. 45, 277 N.W.2d 430 (1979). *See also Wood Chevrolet Co., Inc. v. Bank of Southeast*, 352 So.2d 1350 (Ala.1977); *International Harvester Credit Corp. v. Associates Financial Services Co., Inc.*, 133 Ga. App. 488, 211 S.E.2d 430 (1974); *Seigel v. Giant Food, Inc.*, 20 Md.App. 611, 318 A.2d 874 (1974); *National Exchange Bank v. Mann*, 81 Wis.2d 352, 260 N.W.2d 716 (1978). Clearly, the parties in this case intended that title to the equipment would pass upon payment of the purchase price. Once Ranier & Associates paid the outstanding amount of that price, it acquired title to the equipment. Moreover, after the final payment was made, the equipment was no longer listed as an asset by Fulghum Construction Company on its records. Instead, Ranier & Associates listed the equipment as its assets and proceeded to lease the equipment to Fulghum. It is irrelevant that Ranier & Associates did not take physical possession of the equipment because no such transfer of physical possession was intended by the parties to occur. Additionally, contrary to the trustee's contention, it is unimportant that the Tennessee motor vehicle statute, T.C.A. § 55–3–118, may state that a certificate of title must be transferred to transfer the title itself. Nondelivery of a certificate of title does not prevent the effective passage of title from the seller to the buyer under section 2–401, even when a state's certificate of title act provides that no title can be acquired until the certificate has been issued or delivered. *See, e. g., Wood Chevrolet Co., Inc. v. Bank of Southeast*, 352 So.2d 1350 (Ala.1977). Section 2–401 governs such transactions, and the title passes without the need for a formal certificate or other document indicating transfer of title.

As this Court concludes that title to the equipment did pass to Ranier & Associates, the trustee would have this Court declare the transaction void as fraudulent. The trustee presents two bases for his position: (1) there was no formal vote of approval of the sale by the shareholders of Fulghum Construction Company, and (2) the sale was allegedly in breach of a fiduciary duty owed by Ranier & Associates to the creditors of Fulghum Construction Company. In support of his initial argument the trustee relies upon the Texas Business Corporation Act, which states in relevant part that any sale of "all or substantially all" of a corporation's assets must be authorized by a formal vote of the corporation's shareholders. The trustee argues that because Ranier & Associates was not in literal compliance with that provision, the sale of equipment is void.

To accept the trustee's position would be to defy common sense. Ranier & Associates was the only shareholder of Fulghum Construction Company, and it was Ranier & Associates who authorized and carried out the equipment sales transaction. The Bankruptcy Court noted correctly that the purpose of the consent provision of the Texas Act, like other similar statutes, is to protect the interests of minority shareholders. Because no minority shareholders exist in this case, it would serve no purpose to require Ranier & Associates to comply strictly with the Act. To be in compliance under the trustee's theory, Ranier & Associates would have had to vote a recommendation of the transaction, give notice to itself of the recommendation and of a meeting to vote on the recommendation, and then at the meeting vote approval of the deal. Clearly, as the Bankruptcy Court concluded, bringing about this sort of charade was not the intent of the Act.

The trustee's second contention has greater merit than his statutory argument, but it too must fail. The trustee argues that Ranier & Associates breached a fiduciary duty to the creditors of Fulghum Construction Company in authorizing and

performing the sale of equipment. This Court agrees with the trustee that the controlling shareholder—and in this case the sole shareholder—of a corporation maintains a fiduciary obligation to not only the minority shareholders but also the creditors of the corporation. *See Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). This Court also agrees with the trustee that a transaction between a controlling shareholder and a corporation, such as the one in question here, is to be given a higher degree of scrutiny than other contracts. *See* 13 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 5834, 5837 (rev. ed. 1970). Examining the equipment sale transaction with even this higher degree of scrutiny, however, this Court still concludes that Ranier & Associates did not breach its duty to the creditors.

The trustee argues that by selling the equipment Ranier & Associates deprived Fulghum Construction Company of valuable assets that would have enabled the company to secure capital under supposedly better conditions than the outright sale provided. This argument is not supported by the facts. Fulghum Construction Company was in dire financial condition at the time Ranier & Associates acquired it. Because of its poor financial position the company was in need of a large infusion of capital. A feasible approach to secure this capital was to have Ranier & Associates acquire financing for the company, and this it did by granting to the defendant lending institutions a security interest in the equipment. Although Ranier & Associates did gain some benefit from the sale, the facts are simply not sufficient to support a finding that the end result was so detrimental to the company that Ranier & Associates somehow breached its fiduciary obligation to either the company or the company's creditors.

For the above reasons, this Court agrees with the Bankruptcy Court that the trustee has no interest in the equipment. The conclusion of the Bankruptcy Court is affirmed.

*Disregarding the Corporate Entity*

The trustee appeals from the ruling of the Bankruptcy Court that the corporate entity of Fulghum Construction Company should not be disregarded and therefore that the defendant Ranier & Associates is not liable for the company's debts. For the reasons stated below, this Court rejects the trustee's effort and affirms the Bankruptcy Court's decision.

■ As the Bankruptcy Court correctly related, under Texas law the corporate entity should be disregarded only as an extraordinary remedy under extreme conditions. The corporate veil has been pierced only in such dire cases as when the corporate fiction has been utilized to defraud existing creditors, to evade an existing obligation, to circumvent a statute, to achieve or perpetuate a monopoly, or to protect the commission of crimes. *See Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340 (1955); *Roylex, Inc. v. Langson Bros. Construction Co.,* 585 S.W.2d 768 (Tex.Civ.App.1979); *William B. Roberts, Inc. v. McDrilling Co.,* 579 S.W.2d 335 (Tex.Civ.App.1979); *Tigrett v. Pointer,* 580 S.W.2d 375 (Tex.Civ.App.1978); *Angus v. Air Coils, Inc.,* 567 S.W.2d 931 (Tex.Civ.App.1978); *Holmes v. Clow,* 533 S.W.2d 99 (Tex.Civ.App.1976); *Minchen v. Van Trease,* 425 S.W.2d 435 (Tex.Civ.App. 1968); *Radio KBUY, Inc. v. Lieurance,* 390 S.W.2d 16 (Tex.Civ.App.1965). From an examination of the facts set forth previously, it is apparent that none of these conditions exist in this case.

The Texas courts have established a two-part test to determine whether the corporate entity should be disregarded. First, the complaining party must demonstrate fraud and a lack of good faith on the part of the controlling shareholder. *Roylex, Inc. v. Langson Bros. Construction Co.,* 585 S.W.2d 768 (Tex.Civ.App.1979); *William B. Roberts, Inc. v. McDrilling Co.,* 579 S.W.2d 335 (Tex.Civ.App.1979); *Hanson Southwest Corp. v. Dal-Mac Construction Co.,* 554 S.W.2d 712 (Tex.Civ.App.1977); *Holmes v. Clow,* 533 S.W.2d 99 (Tex.Civ.App.1976); *Radio KBUY, Inc. v. Lieurance,* 390 S.W.2d 16 (Tex.Civ.App.1965). Second, the com-

plaining party must show a degree of stockholder control that the corporation retains no separate corporate interests of its own. *Angus v. Air Coils, Inc.*, 567 S.W.2d 931 (Tex.Civ.App.1978); *Hanson Southwest Corp. v. Dal-Mac Construction Co.*, 554 S.W.2d 712 (Tex.Civ.App.1977); *Simon v. Estate of Allen*, 497 S.W.2d 800 (Tex.Civ. App.1973), *cert. denied*, 419 U.S. 843, 95 S.Ct. 76, 42 L.Ed.2d 71 (1974). The trustee has failed to show that either of these factors exist.

■ One indication of fraud and bad faith on the part of the controlling shareholder is corporate capitalization that is very small in relation to the nature of the corporation's business and to the risks that the business necessarily entails. *Arnold v. Phillips (In re Southern Brewing Co.)*, 117 F.2d 497 (5th Cir.), *cert. denied*, 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941). For fraud and bad faith to be found, however, the inadequate capitalization must exist at the time of incorporation. *Moore & Moore Drilling Co. v. White*, 345 S.W.2d 550 (Tex.Civ.App.1961). Such was clearly not true in this case. Although Fulghum Construction Company was acutely underfinanced at all times after Ranier & Associates purchased its stock in 1977, it was not so at the time of its inception.

■ Additionally, the Texas courts have set forth a number of factors to determine whether the requisite degree of shareholder control exists to warrant piercing the corporate veil. These include:

(1) commencement of business without the issuance of shares;

(2) a lack of shareholder or directors' meetings or of the signing of consents;

(3) the making of decisions by shareholders as if they were partners;

(4) a failure to distinguish between corporate property and personal property;

(5) the use of corporate funds to pay personal expenses without proper accounting; and

(6) a failure to maintain complete and separate corporate and financial records.

*Roylex, Inc. v. Langson Bros. Construction Co.*, 585 S.W.2d 768, 772 (Tex.Civ.App.1979). None of these factors are applicable in this case. Moreover, as the Bankruptcy Court correctly stated,

Evidence of informality or a commingling of shareholder and corporate affairs [such as occurred here], however, alone is insufficient to justify disregarding the corporate entity in the absence of bad faith on the part of the controlling shareholder or prejudice to third parties.... There must be a showing that the individual who controls the corporation and manages its business affairs does so in such a manner that individual or corporate creditors may be deprived of their legal rights by a shuffling of the legal personalities of the corporation and its controller to the extent that the corporation is, in fact, the alter ego of the controller or that the corporate formalities were not adhered to by the corporation in connection with the matters in question. *William B. Roberts, Inc. v. McDrilling Co.*, 579 S.W.2d 335 (Tex.Civ.App.1979).

No. 380–00235 at 12. Although Ranier & Associates and Fulghum Construction Company might not at all times have kept the ideal degree of separation between themselves, it cannot be said that the shareholder so dominated the company or that the company's creditors were so prejudiced to justify disregarding the corporate entity. This Court agrees with the Bankruptcy Court that

[a]ll of the proof indicates that all of the funds advanced to Fulghum in whatever form during 1978 and 1979 were intended to rehabilitate the company and to keep it solvent.... The actions taken by Ranier & Associates after their purchase of Fulghum in 1977—the termination of the company's old management and the hiring of a new executive vice-president, the exercise by Nolan of complete control over the company's financial affairs, the transfer of the company's bank accounts to the Mt. Sterling bank, and the ad-

vances by Ranier & Associates during 1979 to meet Fulghum's payroll—are more indicative of an intent on the part of Ranier & Associates to rehabilitate the company than an intent by the shareholder to use the corporate shell for its own purposes.

No. 380–00235 at 14. As the Bankruptcy Court also correctly noted, simply having a unity of financial interest between the shareholder and company does not warrant piercing the veil, nor does the fact that the shareholder puts money into the corporation. *Angus v. Air Coils, Inc.*, 567 S.W.2d 931 (Tex.Civ.App.1978). There must also be some indication of bad faith or fraud on the part of the controlling shareholder. Even utilizing the "holistic" approach urged by the trustee and considering all the facts together, this Court must conclude that the trustee has not shown that such bad faith or fraud exists. *See Cupples Coiled Pipe, Inc. v. Esco Supply Co.*, 591 S.W.2d 615 (Tex.Civ.App.1979).

The conclusion of the Bankruptcy Court is thus affirmed.

### The Net-Result Rule

The trustee also seeks to have this Court overturn the ruling of the Bankruptcy Court with regard to the series of financial transactions that occurred between the debtor and the shareholder during the months of June through November 1979. Because these transactions left the debtor in debt to the shareholder in the amount of $387,844.16, the Bankruptcy Court ruled that the payments made by the debtor to the shareholder did not constitute preferential transfers under section 547(b) of the Bankruptcy Code and were therefore not voidable by the trustee. The trustee argues that this finding is erroneous and that all of the payments made by the debtor are preferences within the meaning of section 547(b) and therefore fully voidable by the trustee. The trustee also argues that even if the shareholder is allowed to set off against these preferences the advances that it made to the debtor, certain of the debtor's payments, totalling approximately

$394,400, are still nonetheless voidable and recoverable by the trustee. This Court agrees with the Bankruptcy Court that the payments were not preferences within the meaning of section 547(b) and are therefore not voidable by the trustee.

At the heart of this dispute is the applicability of the so-called "net result" rule to the facts of this case. The central issue is whether the net result rule is operative under section 547(b) in the determination of whether a preferential transfer has actually been made or whether the rule exists only under section 547(c)(4) and applies only after a preference has already been determined to exist to enable a creditor to balance out certain transactions with the debtor.

Section 547(b) of the Bankruptcy Code sets forth the components of a preference. That section states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition, or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Bankruptcy Court found as fact that the shareholder was a creditor of the debtor, that the payments made by the debtor to the shareholder were for or on account of an antecedent debt, that the debtor was insolvent at the time the payments were made, and that the shareholder—an "insider"—knew that the debtor was insolvent. Because these findings are not clearly erroneous, they are accepted by this Court. *See* Rule 810, Rules of Bankruptcy Procedure. Thus, the payments by the debtor clearly satisfy the requirements of subsections (1)–(4) of section 547. The dispute in this case, then, is over whether the payments also satisfy the final requirement of section 547(b)(5), which states in relevant part that to be a preference a payment must "enable . . . such creditor to receive more than such creditor would receive if . . . the transfer had not been made. . . ."

As the Bankruptcy Court stated, the test for determining whether the requirement of section 547(b)(5) has been met is "whether the creditor obtained from the debtor's property a greater percentage of his debt than some other creditor would have received under the distributive provisions of the Code had the transfer not occurred." 7 B.R. at 639. 4 Collier, Bankruptcy ¶ 547.35 (15th ed. 1980). The Bankruptcy Court also stated that

> [w]hether a creditor has received a preference under the [Bankruptcy] Act was determined not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the *actual effect* of the payment as determined when bankruptcy results.

*Id.* In applying the above-stated test, then, the Bankruptcy Court employed a "net result" approach. Under this approach the Bankruptcy Court examined whether the net effect of all the transactions between the debtor and the shareholder was actually to deplete the debtor's estate and thereby interfere with an equal distribution of the debtor's assets among creditors or whether the net effect was to increase the debtor's estate and thereby benefit all the creditors.

Because the net result of the transactions was to increase the debtor's estate, in that the shareholder advanced $387,844.16 more than it received in return, the Bankruptcy Court ruled that the section 547(b)(5) requirement had not been met. The Bankruptcy Court thus held that the payments were not voidable transfers under section 547(b).

In appealing the Bankruptcy Court's decision to this Court, the trustee argues that the Bankruptcy Court misapplied—and misunderstood—the net result rule. The trustee argues that the net result rule has nothing whatsoever to do with section 547(b). Instead, the trustee argues, the net result rule is a defense of sorts that a creditor may raise under section 547(c)(4) only *after* a preferential transfer has been found to have been made under section 547(b). Under the trustee's interpretation, then, the net result rule does not preclude the existence of a preference, but rather, only immunizes certain preferential payments from avoidance by the trustee, provided the transfers meet the specifications of section 547(c)(4). The trustee criticizes the Bankruptcy Court for, in his words, "injecting" the net result rule into section 547(b)(5).

The trustee has offered a number of arguments in support of his position, but this Court concludes that it must respectfully reject them all. Rather than there being only one net result rule—embodied in section 547(c)(4) as the trustee urges—this Court must agree with the Bankruptcy Court that two "net result rules" actually exist in bankruptcy law. One, that of section 547(c)(4) and insisted upon by the trustee, is statutory. The other, that applied by the Bankruptcy Court, is nonstatutory, a judicial gloss upon the requirements of section 547(b).

The Bankruptcy Court's thorough review of the relevant case law indicates clearly that over the years the courts have utilized a net result approach under section 60(a) of the old Bankruptcy Act, the predecessor to section 547(b), as well as under section 60(c)

of the Act, the predecessor to section 547(c)(4). *See Joseph Wild & Co. v. Provident Life & Trust Co.*, 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003 (1909); *Yaple v. Dahl-Millikan Grocery Co.*, 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904); *Jaquith v. Alden*, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903); *Federal International Banking Co. v. Childs (In re Fred Stern & Co.)*, 54 F.2d 478 (2d Cir. 1931); *Mills v. J. H. Fisher & Co.*, 159 F. 897 (6th Cir. 1908). *See also In re Sagor & Brother*, 9 Am.Bkrtcy.Rptr. 361 (2d Cir. 1903); *Gans v. Ellison*, 114 F. 734 (3d Cir. 1902); *Kimball v. E. A. Rosenham Co.*, 114 F. 85 (8th Cir. 1902); *Dickson v. Wyman*, 111 F. 726 (1st Cir. 1901). Commentary on the old Act also confirms use of the net result rule under section 60(a):

> The net result rule developed in the days when preferences were voidable even though there was no knowledge or reasonable cause to believe insolvency of the debtor. It provided that if there is a running account of credit and payment, the entire transactions over the 4 months are examined and if more credits than payments occurred, even though individual payments during the period might comprise a preference, there is no preference. That is, if the net result enriches the estate there is no preference. Indications are that the rule would apply partially. That is, a transfer was only preferential to the extent that transfers exceeded credits to the debtor.

2 Cowans, Bankruptcy Law and Practice § 474 (2d ed. 1978) (citations omitted).

The rationale for application of the net result rule to the determination of preferences under section 60(a) was stated cogently by the Second Circuit in *Federal International Banking Co. v. Childs (In re Fred Stern & Co.)*, 54 F.2d 478 (2d Cir. 1931):

> It is unjust to hold that, because the appellee has in the ordinary course of business during the four months preceding bankruptcy received payments which, under similar circumstances, might operate as a preference in some views of the law, it will bar the proof of this claim when, looking at all the transactions together, they demonstrate they were without any intention to acquire or to give any unjust preferences, and particularly where they have increased the net indebtedness to the creditor and effected a corresponding increase of the bankrupt's estate.... In order to avoid such an unreasonable result, it is proper to hold that all the transactions covered by this account will be regarded as one, so that it may not be held that the effect of any of the payments was to enable the appellee to obtain a greater percentage of its debt than any other creditor of the same class, within the meaning of the Bankruptcy Act.... The test in determining the absence or existence of a preference is whether or not the entire course of dealings on the open account, resulting from this revolving credit, resulted in the enrichment of the insolvent estate.

54 F.2d at 480. Clearly, in the case before this Court, the overall result of the transactions between the debtor and the shareholder was to enrich the estate of the debtor by nearly $400,000. To adopt the position urged by the trustee that the debtor's payments to the creditor were preferences potentially voidable by the trustee would be to bring about exactly the sort of "unjust" and "unreasonable" result opposed by *Sterns* and the other decisions cited above. This Court thus agrees with the Bankruptcy Court that the net result rule has not been limited to section 60(c). The net result rule is properly applicable under section 60(a)— now section 547(b)(5)—and seems well suited to use in this particular case.

■ Before this Court can say conclusively, however, that the payments made by the debtor to the shareholder in this case are not preferences, one other issue must be addressed: whether the shareholder's knowledge of the debtor's insolvency precludes application of the net result rule in this particular case. This Court agrees with the Bankruptcy Court that it does not.

The trustee argues that the decisions of those courts applying the net result rule in any respect have predicated their conclusions on the creditor's ignorance of the

debtor's bankrupt status. In other words, the trustee argues that any knowledge by a creditor of a debtor's precarious financial situation prevents application of the net result rule to the transactions between them. In support of his contention, the trustee relies upon several decisions that have in fact stated that the net result rule is inapplicable under such circumstances. *See Cooper Petroleum Co. v. Hart,* 379 F.2d 777 (5th Cir. 1967); *Campanella v. Liebowitz (In re Peter Cassinelli Macaroni Co.),* 103 F.2d 252 (3d Cir. 1939); *In re Grocers' Baking Co.,* 266 F. 900 (M.D. & N.D.Ala. 1920), aff'd sub nom. *Eagleston v. Birmingham Trust & Savings Co.,* 277 F. 1015 (5th Cir. 1921); *In re Farmer's Store & Supply Co.,* 214 F. 505 (N.D.Wash.1914). The trustee relies in particular on *Cooper Petroleum Co. v. Hart,* 379 F.2d 777 (5th Cir. 1967), in which the Fifth Circuit ruled that the net result rule was inapplicable when a creditor knows or has sufficient reason to know that the debtor is insolvent at the time the transactions take place. The Fifth Circuit based its decision to a great extent on its conclusion that

> the Supreme Court decisions in which the rule arose as well as subsequent cases relying upon those decisions appear to have placed much more emphasis upon the creditor's lack of knowledge of the debtor's insolvency to justify application of the rule than upon any rationalization as to enrichment of the debtor's estate.

379 F.2d at 780.

While the cases cited by the trustee are strong support for his position, there are, as the Bankruptcy Court noted, several decisions in which a creditor's knowledge of the debtor's insolvency did not affect application of the net result rule. *See Farmers Bank v. Julian,* 383 F.2d 314 (8th Cir.), *cert. denied,* 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967); *Wilson v. Kanter (In re Marley-Morse Co.),* 275 F. 832 (7th Cir. 1921); *In re Stewart,* 233 F.Supp. 89 (D.Or. 1964). The thrust of these decisions is not only that the enrichment of the debtor's estate is far more important than the creditor's knowledge of the debtor's financial status in determining the applicability of

the rule, but also that strong policy considerations make the creditor's knowledge irrelevant. As the court in *In re Stewart* declared, to deny application of the net result rule simply because the creditor is aware of the debtor's condition

> would create chaos in that vast area of business relationships where the creditor has knowledge of the debtor's difficulty, but desires to assist in solving the problems by going along with the debtor on an arrangement similar to [the one presented here].... [A] plan such as that, time after time, assists the debtor in putting his house in order, paying all creditors and making a success of his own venture. To treat such a transaction as a preference within the meaning of the bankruptcy act would be nothing short of placing a premium, or a brand of approval, on the actions of those creditors who do not attempt to assist the debtor, but on the other hand attach the property and thus force the debtor out of business.

233 F.Supp. at 92.

The Bankruptcy Court was persuaded by the force and logic of these latter decisions and ruled that the shareholder's knowledge of the debtor's insolvency in this case did not preclude applying the net result rule here. This Court believes that the Bankruptcy Court's conclusion is correct. Having reviewed the Supreme Court's decisions in *Joseph Wild, Yaple,* and *Jaquith,* this Court does not agree with the conclusion of the Fifth Circuit in *Cooper Petroleum* or the position of the trustee in this case that those decisions depended on the knowledge, or lack thereof, of the creditor. In fact, from a close reading of the three decisions, it is difficult to discern any support in the opinions for the proposition that the creditor's knowledge was in any way determinative of the results reached by the Court. Although the creditor's lack of knowledge of the debtor's insolvency was posed by counsel as one component of one question for review in *Yaple,* the Court summarily applied the net result rule to the facts of that case and in no way indicated that the issue of knowledge was influential in its

decision. 193 U.S. at 527, 24 S.Ct. at 553, 48 L.Ed. at 776. Indeed, in *Joseph Wild*, the Court declared that *Yaple* stood for the specific principle that

> where a creditor has a claim upon an open account for goods sold and delivered during the period of four months before the adjudication in bankruptcy, the account being made up of debits and credits, leaving a net amount due from the bankrupt estate, . . . payments made under such circumstances [do] not constitute preferences. . . .

214 U.S. at 297, 29 S.Ct. at 619, 53 L.Ed. at 1004. No mention is made of the creditor's knowledge or lack of knowledge.

As is apparent, disagreement exists among the courts regarding the question of a creditor's knowledge of insolvency. In the absence of any clear weight of authority on either side of this issue, this Court believes that the better rule of law is that a creditor's knowledge does not preclude application of the net result rule to determine the existence or nonexistence of preferential transfers under section 547(b) of the Bankruptcy Code. In addition to agreeing with the extremely persuasive policy argument articulated by the court in *In re Stewart*, this Court concurs with the position of the Bankruptcy Court that requiring ignorance of insolvency would be inconsistent not only with the requirements of section 60(a), as it existed, but also with the requirements of the present section 547(b) with regard to both insiders and others. *See* 7 B.R. at 647. Moreover, this Court agrees with the Bankruptcy Court that such a knowledge factor

> would be inconsistent with the fundamental purpose for the voidable preference provisions of the Code, which is not the imposition of a penalty upon creditors preferred by the debtor, but the equitable distribution of the debtor's assets among all creditors.

*Id.* Application of the net result rule to the present case ensures that the goal of equitable distribution will be met.

As a final point with regard to this issue, the trustee argues that even if the net result rule is applicable, the shareholder must have made each advance after a payment by the debtor in order to escape avoidance. Under this argument, the shareholder would be entitled to set off $837,000 of the advances made by it to the debtor, while being required to return approximately $394,400 in payments. This latter sum is the amount that the trustee alleges that payments by the debtor exceeded subsequent advances by the shareholder after July 27, 1979. The Court respectfully rejects this argument. Even if the transactions between the shareholder and the debtor could be dichotomized by the July 27 date—a notion upon which this Court declines to comment—the trustee's argument is irrelevant because it is based upon a reading of the set-off provision of section 547(c)(4). *See* 2 Cowans, Bankruptcy Law and Practice § 474 (2d ed. 1978). Since section 547(c) is never called into play unless a preference is found to exist and since this Court agrees with the Bankruptcy Court that the payments made by the debtor here were not preferences, the trustee's argument must fail as moot. This Court offers no opinion about the validity of the argument in a case in which preferential transfers are found to exist.

For all of the foregoing reasons, this Court agrees with the Bankruptcy Court that the payments here in question were not to any extent preferences under section 547 of the Bankruptcy Code. The conclusion of the Bankruptcy Court is affirmed.

### *Ranier & Associates' Counterclaim*

The last issue to be resolved in this case is the counterclaim by Ranier & Associates against the trustee for damages allegedly incurred because of the trustee's detention of the above-discussed equipment during the initial stages of the bankruptcy procedure. Although Ranier & Associates asserts that it suffered $354,764 in damages, which sum it alleges it could have acquired by renting out the equipment, the Bankruptcy Court found that Ranier & Associates offered no proof that such damage actually was suffered. This Court agrees

with the Bankruptcy Court that no proof of any damage suffered by Ranier & Associates because of the trustee's actions exists in the record. Accordingly, this Court concludes that the Bankruptcy Court acted correctly in dismissing the counterclaim.