In re **FULGHUM CONSTRUCTION CORPORATION.**

Robert H. **WALDSCHMIDT, Trustee,**

v.

Harry **RANIER, et al.**

No. 3–85–0713.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 7, 1987.

---

Robert Waldschmidt, Hale, Fisher, Branham and North, Nashville, Tenn., for plaintiff.

L. Wearen Hughes, Bass, Berry & Sims, Nashville, Tenn., Tom H. Pierce, Robert L. Swisher, Rouse, Rouse, Combs & Pierce, Versaille, Ky., for defendants.

## MEMORANDUM

HIGGINS, District Judge.

An involuntary petition was filed in the United States Bankruptcy Court for the Middle District of Tennessee against Fulghum Construction Corporation (Fulghum, debtor or Corporation) on January 25, 1980. An order for relief was entered on March 17, 1980. On February 6, 1980, the Trustee for Fulghum, Robert H. Waldschmidt, filed this proceeding against Harry Ranier, Algin Nolan, and Ranier & Associates. Ranier & Associates was the sole shareholder of Fulghum. The Trustee sought to set aside a sale of equipment from the debtor Fulghum to the defendant Ranier & Associates and also sought to avoid certain monetary transactions which occurred between the two parties in 1979, contending that such transactions constituted preferential transfers. This matter was tried before the bankruptcy court on May 22 and 23, 1980. On July 14, 1980, Judge Hippe entered a partial judgment and memorandum holding that the Trustee had no interest in the equipment. Judge Hippe applied the "net result rule" in connection with the analysis of 11 U.S.C. § 547(b)(5) and held on November 28, 1980, that the transactions were not preferences and that the creditor had not proven any damages. The determination that the transactions were not preferences eliminated the need to examine the 11 U.S.C. § 547(c)(1) and (c)(2) exceptions, although Judge Hippe stated that the exceptions "appeared" unavoidable. *Waldschmidt v. Ranier* (*In re Fulghum Construction Company*), 7 B.R. 629 (Bankr.M.D.Tenn.1980). An appeal was taken to the United States District Court

for the Middle District of Tennessee. On September 18, 1981, Judge Wiseman affirmed the decision of Judge Hippe. Judge Wiseman did not address the issue of the applicability of § 547(c)(1) and (c)(2). *In re Fulghum Construction Corporation,* 14 B.R. 293 (Bankr.M.D.Tenn.1981).

The case was then appealed to the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit reversed and remanded the case on the issue of whether the transactions constituted preferential transfers. It also made a determination on the issue of the application of the net result rule, holding that the judicial interposition of the net result rule into § 547(c)(5) vitiates the congressional intent clearly reflected both on the face of § 547 and in the legislative history of the enactment. It affirmed the lower courts in all other respects on May 9, 1983. *Waldschmidt v. Ranier (In re Fulghum Construction Corporation),* 706 F.2d 171 (6th Cir.1983). By order of the district court, the case was remanded to the bankruptcy court consistent with the Sixth Circuit decision. The bankruptcy court determined that the majority of the transactions between the debtor Fulghum and the defendant Ranier & Associates cannot be excepted from avoidance. The court determined that the defendant received preferential payments totaling $197,432.00. On December 7, 1984, the bankruptcy court ordered the defendant Ranier & Associates to turn over to the Trustee the $197,432.00 plus interest. Also, on December 7, 1984, the bankruptcy judge ruled that neither 11 U.S.C. § 547(c)(1) nor (c)(2) applied. On January 7, 1985, Judge Paine entered an order denying the motion to alter or amend to the extent the motion sought either the deletion of prejudgment interest or a later date for the commencement of the interest. On June 10, 1985, the bankruptcy judge entered an order to supplement the record on appeal adding the March 26, 1980, press release but denying Ranier & Associates'

motion relative to the remaining press releases for 1980.[1]

On January 17, 1985, the defendants filed a notice of appeal for the judgment and memorandum entered December 7, 1984, 45 B.R. 112, and the order entered January 7, 1985, and they were transmitted to this Court. On June 20, 1985, the defendant Ranier & Associates appealed the order entered on June 10, 1985. The Trustee filed a motion in bankruptcy court seeking to modify the December 7, 1984, judgment to include Harry Ranier and Algin Nolen, individually. After a hearing on October 1, 1985, the bankruptcy judge entered an order granting the Trustee's motion. On October 9, 1985, this Court entered an order that the appeal presently pending before this Court shall be deemed to be an appeal filed by Harry Ranier, Algin Nolan and Ranier & Associates from the December 7, 1984, judgment and the January 7, 1985, order, as subsequently modified to include Harry Ranier and Algin Nolan, individually.

On appeal, there are three issues before this Court. The first issue is whether the bankruptcy court was correct in determining that the payment to Ranier & Associates on November 30, 1979, was not a substantially-contemporaneous exchange within the meaning of 11 U.S.C. § 547(c)(1) and was not in the regular course of business within the meaning of 11 U.S.C. § 547(c)(2). The second issue is whether the bankruptcy court should have permitted the record to be supplemented to include other press releases which were not related to the amount of interest being applied in this case. The third issue is whether the bankruptcy court was proper in awarding prejudgment interest.

Jurisdiction is based on 28 U.S.C. § 158. For the reasons set forth below, the judgment of the bankruptcy court is affirmed.

## I.

Fulghum Construction Corporation was incorporated in Texas in 1966. It was in-

---

1. The press releases referenced in this memorandum are press releases issued by the United States Department of the Treasury which establish the interest rate at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) to the average accepted auction price for the last auction of fifty-two week United States Treasury bills.

volved in the construction of oil and natural gas pipe lines. Fulghum's principal place of business was Lavergne, Tennessee. The Corporation was owned by James T. Fulghum and J.B. Miller. Mr. Miller also managed the operation of the business.

Fulghum had a long history in the construction business, during which time it accumulated a large amount of equipment. The losses it experienced through 1977, however, caused a need for additional operating capital. Consequently, in October 1977 all of the common stock of Fulghum was purchased by Mr. Ranier and Mr. Neale R. Hall. In July of 1978, Mr. Hall transferred his stock to Mr. Nolan and a partnership was formed between Mr. Ranier and Mr. Nolan under the name of Ranier & Associates. Ranier & Associates is a Kentucky general partnership formed in February 1978 and located in Mount Sterling, Kentucky. The partnership consists of Harry Ranier, who owns a 60 percent interest and Algin Nolan who owns a 40 percent interest. The partnership has owned real estate and stock in various companies, operated an equipment leasing business and served as a paid management, accounting and financial advisor primarily to companies in which it or the Ranier family had an interest. Ranier & Associates has continued as Fulghum's sole shareholder since July, 1978.

Mr. Fulghum and Mr. Miller continued to manage the Corporation after Ranier & Associates' acquisition. They retained the Corporation's principal place of business in Tennessee but opened an executive office in Mt. Sterling, Kentucky. Fulghum sublet space from, and paid rent to, Ranier & Associates at the Mt. Sterling office. Despite Fulghum's acquisition, the capital shortage continued and was in fact accentuated because Mr. Fulghum and Mr. Miller personally misappropriated funds of approximately $194,000.00. After July 1978, Mr. Miller and Mr. Fulghum were relieved of operational responsibilities when their misappropriation of funds was discovered. As a result of the misappropriation of funds, Mr. Nolan was given extraordinary powers to manage the Corporation. From this time on, Fulghum acted under the guidance of Ranier & Associates. Fulghum took no independent actions until it filed bankruptcy. Both Mr. Nolan and Mr. Ranier provided accounting and management services and arranged for the availability of operating funds for the Corporation on a short- and long-term basis.

In the months preceding September 1978, Fulghum had been at a standstill. In order to assist Fulghum, Ranier injected $188,-000.00 of capital into the Corporation which resulted in an increase in Fulghum's net worth. On September 20, 1978, Fulghum and Rainer & Associates entered into a sale and leaseback agreement. Fulghum acknowledged receipt of $1,137,350.00 from Ranier & Associates, and Ranier & Associates agreed to lease the Corporation's equipment back for the Corporation's use. After the sale and leaseback transaction, Fulghum no longer represented to creditors that it owned the equipment, and its books and records, including audit reports, also reflected that it no longer owned the equipment. Fulghum did, however, retain possession of all the documentation concerning the equipment, as well as the equipment itself. The lease insured the availability of the equipment to Fulghum, but Fulghum only paid rent during the period the equipment was actually in use.

Michael Leatherman was hired as an expert to solicit work and get Fulghum, in its improved financial condition, back on bid lists across the country. The Corporation obtained several construction contracts shortly after September 1978 and the funding of these projects was supplied directly by Ranier & Associates in the form of short-term transfers to the Corporation. Fulghum was required by Ranier & Associates to loan Ranier & Associates approximately $187,000.00 of the sale and leaseback proceeds as security against another possible incident of misappropriation of corporate funds. Therefore, Ranier & Associates executed a promissory note to Fulghum for that amount, which was repaid by Ranier & Associates to Fulghum during the spring of 1979 when funds were needed by Fulghum.

During the last six months of the operation of the business (June 1979 through November 1979) over 45 transactions occurred involving transfers between Ranier & Associates and Fulghum. Summarily, these transactions indicate that from June 1979 to July 27, 1979, Ranier & Associates advanced approximately $1,115,000.00 to Fulghum and received approximately $159,000.00 from Fulghum. From the end of July, 1979, to the end of November, 1979, Ranier & Associates advanced $837,000.00 to Fulghum and received back $1,231,400.00. No interest was ever charged on the advances made by Ranier & Associates.

Money was therefore made available to Fulghum by Ranier & Associates as the need arose. The bridging by Ranier & Associates of Fulghum's short-term cash flow problems was based on cost projections and anticipated profits by Fulghum. To keep the operation going, the payroll had to be met, so Ranier & Associates would make temporary advances which were intended to be interim financial arrangements and not capital contributions. These advances were repaid when Fulghum received payments from its jobs.

Mr. Nolan often covered overdrafts of Fulghum at the Mount Sterling National Bank. However, during the summer of 1979, Mr. Nolan was out of town for a four-week period and his office could not arrange immediate funding to cover the check to the Internal Revenue Service for Fulghum's withholding and social security taxes. In late November 1979, Mr. Nolan became aware that Fulghum had been incurring a substantial withholding tax liability. This fact, compounded with the prediction of substantial operating losses, caused Mr. Nolan to shut down the operations of the Corporation.

Ranier & Associates advanced to Fulghum during 1979 and early 1980 some $430,000.00 more than was received in return. This amount included about $42,000.00 which Ranier & Associates advanced to cover payroll for Fulghum. Fulghum also still owed about $209,000.00 for equipment rental and accounting fees. All of this activity subsequently resulted in the filing of the bankruptcy petition.

## II.

■ The district court is to review the bankruptcy judge's proposed findings of fact and conclusions of law in accordance with 28 U.S.C. § 158. The Trustee contends that the bankruptcy court made findings of fact, not conclusions of law, with respect to the issue of exceptions under 11 U.S.C. § 547(c)(1) and (c)(2). The Court agrees. The Sixth Circuit has stated that the issue of contemporaneousness required for the applicability of § 547(c)(1) "is a question of fact." *In re Arnett*, 731 F.2d 358 (6th Cir.1984). The "ordinary course of business" exception, § 547(c)(2), is also a question of fact. Since the bankruptcy court's findings are of fact and not of law, Rule 810 of the Rules of Bankruptcy Procedure dictates that the appellate court accept those findings unless clearly erroneous. If no rational relationship exists to uphold the evidentiary data upon which the Bankruptcy Judge relied then this Court may find clear error. The district court is, however, to pay deference to the factual findings of the judicial officers who have heard the evidence rather than merely to review a cold record. *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). The issue before the Court, then, is whether the defendant has made a showing of clear error with respect to the bankruptcy court's determination of the exceptions under § 547(c)(1) and (2). The Court finds that the defendant has failed to make such a showing.

In the instant case, the parties do not dispute that transfers from the creditor, Ranier & Associates, to the debtor, Fulghum Construction Corporation, were voidable; however, they do dispute the applicability of the exceptions. "For the purpose of section 547 the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this sec-

tion." 11 U.S.C. § 547(g) (West Supp. 1986). If the transfer satisfies the requirements of the statutory exceptions in § 547(c), it will be insulated from attack as a preference by the Trustee. *In re Bishop*, 17 B.R. 180 (Bankr.N.D.Ga.1982).

Section 547(c)(1) contains two requirements for the contemporaneous exchange exception: the trustee may not avoid a transfer to the extent that the transfer was "(A) intended by the debtor and creditor ... to be a contemporaneous exchange for new value given to the debtor," and was "(B) in fact a substantially contemporaneous exchange." Section 547(c)(1) provides, then, that when the transferor and the transferee intend a contemporaneous exchange for new value given to the debtor, the transfer[2] will not be assailable as a preference if the exchange is "substantially contemporaneous." *Dean v. Davis*, 242 U.S. 438, 443, 37 S.Ct. 130, 61 L.Ed.2d 419 (1917).

■ The first inquiry under § 547(c)(1)(A) "is whether the parties at the outset intended the exchange to be contemporaneous." 4 Collier on Bankruptcy § 547.38 (15th ed. 1985). Exploring the intent of the parties requires an examination of the facts. In the case at bar, the creditor (after having withdrawn funds from the debtor through the power of its status as a parent corporation) essentially transferred funds to the debtor at times when the debtor needed money to meet its obligations. Fulghum subsequently transferred sums back to the creditor after Fulghum had received money from its pipeline construction business.

The parties presented no evidence that these advances were intended to be a contemporaneous exchange for value. The hiatus between the loan and receipt of repayment from Fulghum indicates, as the bankruptcy court found, that the transactions were not in fact substantially contemporaneous. Ranier & Associates had to wait for Fulghum to receive payments before it was reimbursed for the funds it loaned to Fulghum.

The word "contemporaneous" in this context is not defined by the Bankruptcy Code, and is left to the courts to interpret the meaning of the term. Fulghum termed these money transactions with Ranier & Associates as "advances." The Court, however, finds that such transactions in fact constituted loans. The Court views these financial dealings as sporadic loans that occurred when Fulghum had a liquidity problem. Funds were loaned by Ranier & Associates under the assumption that when Fulghum received payment from its construction projects, Ranier & Associates would be repaid. There is no indication in the record that time deadlines for repayment were issued by Ranier & Associates. No where does the record indicate that these were contemporaneous exchanges and that Fulghum came under a duty to repay the money at the time that the money was advanced by Ranier & Associates. These advances were made by Ranier & Associates to Fulghum so that Fulghum could continue its construction operations despite its cash flow problem. These advances to Fulghum were not in the normal course of business between the corporations. They resulted because of undercapitalization. Ranier & Associates made payroll advances to keep Fulghum afloat and maintain its operations.

Section 547(c)(1)(A) includes a second requirement, an exchange for "new value." New value is defined in § 547(a)(2) as "money or money's worth in goods, service or new credit ... but does not include an obligation substituted for an existing obligation." In the instant case, the Court finds that the debtor's transfer was not for new value in the form of new credit. Instead of new credit, the entire amount of the transfer was credited to past debt. *See In re Rustia*, 20 B.R. 131 (Bankr.S.D.N.Y. 1982).

---

**2.** "Transfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including reten-

tion title as security interest and foreclosure of the debtor's equity of redemption." 11 U.S.C. § 101 (48) (West Supp.1986).

In addition to finding an absence of intent and new value as required under § 547(c)(1)(A), the Court also finds no showing of actual contemporaneity as required by § 547(c)(1)(B). Subpart (B) is the factual requirement that the exchange is in fact substantially contemporaneous. The Court finds that such loans do not constitute a contemporaneous exchange. *See In re Arctic Air Conditioning, Inc.*, 35 B.R. 107, 109 (Bankr.E.D.Tenn.1983) ("contemporaneous" does not apply to repayment of a loan made thirty (30) days before).

The legislative history of the Bankruptcy Reform Act of 1978 demonstrates that the purpose of the § 547(c)(1) exception was to make legitimate the transactions which were conducted by check, but not to apply to credit transactions. H.R.Rep. No. 595, 95th Cong. 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6049. The basic exception was its application to cash transactions, or transactions which took place in a contemporaneous manner— not to transactions in which one party relied on the creditworthiness of the other party. *See In re Fabric Buys of Jericho, Inc.*, 22 B.R. 1013, 1016 (Bankr.S.D.N.Y. 1982). Ranier & Associates gave Fulghum funds based on Fulghum's anticipated payment for work done on the pipeline projects. Ranier & Associates was relying on the creditworthiness of Fulghum. There is no indication in the legislative history that Congress intended § 547(c)(1) to be a general exception covering loans which neither are written nor backed by collateral.

The creditor relies on *In re Schmidt*, 26 B.R. 89 (Bankr.D.Minn.1982) in its argument that 547(c)(1) applies to the instant case. *Schmidt* entailed a series of bank overdrafts which the bank paid on the customer's behalf, and the subsequent repayment of those overdrafts. While the situation in *Schmidt* resembles a short-term loan, it was construed by the court as a substantially contemporaneous exchange on the basis of the regular nature of the repayment schedule. In this respect, the facts in *Schmidt* differ from those in the instant case in which no specific pattern of repayment has been established, and thus contemporaneity has not been proven. *In re Top Sport Distributors, Inc.*, 41 B.R. 235 (Bankr.S.D.Fla.1984) presents a similar situation, in which employees incurred expenses for travel as a part of their job responsibilities, and were subsequently reimbursed by the employer for those expenses. The employer made these reimbursements regularly, and in specific amounts in accordance with the expenses incurred. The regular nature of the payments and the specific amount of the payments create a rationale for finding that they were contemporaneous, and also distinguish *Top Sport* from the case at hand.

A further exception to avoidance of preferential transfers is contained in § 547(c)(2), the "ordinary course of business" exception. The purpose of this exception is essentially to encourage the continuation of normal business practices in the short term when bankruptcy is an apparent possibility. In "The Concept of a Voidable Preference in Bankruptcy," 38 *Vand.L.Rev.* 713, 769 (1985), Professor Countryman states that "[c]learly, Congress intended to limit the exception to the payment of current expenses." "Ordinary course of business" is not defined by the Bankruptcy Act. Courts, however, have narrowly interpreted this exception, due, possibly, to its potentially expansive nature. *See, e.g., U.S. v. Rutherford*, 442 U.S. 544, 552, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979); *Brennan v. Valley Towing Co., Inc.*, 515 F.2d 100, 110 (9th Cir. 1975); *In re Kennesaw Mint, Inc.*, 32 B.R. 799 (Bankr.N.D.Ga.1983); *In re Craig Oil Co.*, 31 B.R. 402 (Bankr.M.D.Ga.1983); *In re Martin County Custom Pools, Inc.*, 37 B.R. 52 (Bankr.S.D.Fla.1984).

Section 547(c)(2) provides that in order to prove an exception to the voidable preference, a creditor must establish that the payment was made in the ordinary course of business of the debtor and transferee. In order to define "ordinary course of business" the Court must focus on the conduct of the parties involved. Thus, "ordinary" contemplates what is ordinary with respect to the parties. *In re Ewald Brothers, Inc.*, 45 B.R. 52, 57 (Bankr.D.Minn.1984); *In re*

*Williams*, 5 B.R. 706, 707 (Bankr.S.D.Ohio 1980). The facts must be examined objectively in order to determine whether it was ordinary for Ranier & Associates to lend funds to Fulghum. The resolution of this issue essentially depends on the narrowness or breadth of the scope used to examine the parties' conduct.

■ Admittedly, Ranier & Associates had received several payments from Fulghum in repayment of prior loans. From one perspective the loans and repayments were commonplace for the parties because of the lack of liquid assets. From a broader business perspective, however, the initial short-term loans made by Ranier & Associates to Fulghum were necessitated by the debtor's unusual undercapitalization and consequent deficiency of funds. The short-term loans, then, were not within the "ordinary course of business" and hence fail to meet the exception. *See In re Western World Funding, Inc.*, 52 B.R. 743, 787 (Bankr.D.Nev.1985). The Court therefore affirms the bankruptcy court's finding that § 547(c)(2) is also inapplicable to establish an exception.

### III.

The defendants have also appealed the prejudgment interest imposed by the bankruptcy court. Alternatively, they have asked that if prejudgment interest is upheld by this Court, the record be supplemented with additional press releases which would establish a different rate of interest.

■ The purpose of awarding interest is to compensate the wronged person for deprivation of the monetary value of the loss from the time of the loss to the payment of the money judgment. *Turner v. Japan Lines, Ltd.*, 702 F.2d 752 (9th Cir.1983). Preference actions are not exempt from the imposition of prejudgment interest and there is a long history of judicial support for awards of prejudgment interest in preference actions. *E.g., Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Foreman Industries, Inc., v. Broadway Sand & Gravel*, 59 B.R. 145, 155 (Bankr.S.D.Ohio 1986); 3 Collier

on Bankruptcy # 60.63[1], at 1129 (14th ed. 1977). Generally, interest should be paid from the time a demand was made for a return of the property, or, in the case where no demand was made, from the date the complaint was filed to the entry of the judgment. *E.g., Kaufman v. Tredway*, 195 U.S. at 273, 25 S.Ct. at 34; *Foreman Industries, Inc., v. Broadway Sand & Gravel*, 59 B.R. at 156. On December 14, 1984, Ranier & Associates filed a motion which sought the deletion of the award of prejudgment interest or the commencement of the running of prejudgment interest from May 9, 1983, the date of the Court of Appeals' decision, or November 2, 1983, the date the Trustee first asked for prejudgment interest. The Court notes that the Trustee's motion for prejudgment interest related back to the complaint which sought the return of the disputed funds. As stated above, the purpose of prejudgment interest is to make the claimant whole and the bankruptcy estate has been denied the use of its money since April of 1980. The filing of the complaint in this action constituted a demand and therefore the interest is to be paid from April 16, 1980, the date the amended complaint was filed, until the entry of the order by this Court.

■ The final issue before this Court is whether the bankruptcy court should have permitted the record to be supplemented to include press releases subsequent to those which constituted the year prior to the filing of the amended complaint. Basically, the issue is whether the rate of interest imposed by the bankruptcy court is fair. The Sixth Circuit Court of Appeals has not directly addressed the rate of prejudgment interest to be applied in a preference action. However, in nonbankruptcy cases involving a federal question where the statute is silent on the issue of interest, the appellate court is to uphold the trial court's decision if it has not abused its discretion. *Newman v. Grand Truck Western Railroad Company*, 781 F.2d 55, 56 (6th Cir. 1985); *Equal Employment Opportunity Commission v. Wooster Brush Company Employees Relief Association*, 727 F.2d 566, 579 (6th Cir.1984); and *Bricklayers'*

**154**

*Pension Trust Fund v. Taiariol*, 671 F.2d 988, 990 (6th Cir.1982). In the case at bar, the Court finds no abuse of discretion.

The legislative history to the 1982 amendment of 28 U.S.C. § 1961 (governing the award of post-judgment interest) indicates that Congress favors the idea of applying the formula laid out in that statute to the award of prejudgment interest. This unified interest rate for the federal courts helps to defray the cost to the party who is denied the use of its money.

The legislative history behind the recent amendment to 28 U.S.C. § 1961 indicates that Congress favors the awarding of prejudgment interest in a federal court where the circumstances warrant and attempts to do so fairly by considering the everchanging costs of borrowing money.

Under current law, the interest rate granted on judgments during appeal is based on varying State laws and frequently falls below the contemporary cost of money. As a consequence, a losing defendant may have an economic incentive to appeal a judgment solely in order to retain his money and accumulate interest on it at the commercial rate during the pendency of the appeal.

Section 302 amends 28 U.S.C. § 1961 by setting a realistic and national rate of interest on judgments in the Federal courts. The provision would tie the post-judgment interest rate to the rate used by the Internal Revenue Service for delinquent taxes under 26 U.S.C. § 6621. That rate is a composit of prime rates from throughout the country that is reviewed and revised periodically. Furthermore, by consolidating all the provisions for interest on judgments of Title 28 into this section, this rate becomes uniformly applicable to all litigation in the Federal courts.

There are presently no generally applicable guidelines concerning the award of prejudgment interest by Federal courts. Yet such interest may be essential in order to compensate the plaintiff or to avoid unjust enrichment of the defendant. For instance, a plaintiff who was unlawfully deprived of the use of $20,-000.00 in 1976, and who did not receive a judgment until 1979, could have obtained $4,500.00 in the three-year intervening period by investing the money at 7 percent compounded interest.

S.Rep. No. 275 97th Cong.2d Sess. 30 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News pp. 11, 40 (discussing Section 302 of the Federal Courts Improvement Act of 1982, P.L. 97–164, 96 Stat. 25).

The Court in the instant case affirms the bankruptcy court's adoption of the post-judgment interest rate set forth in 28 U.S. C. § 1961(a) as a measuring stick for prejudgment interest:

Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

28 U.S.C. § 1961(c). This rate was utilized by the bankruptcy court. Because there is a fluctuating interest rate in our society, there must be some barometer by which to measure an interest rate that is fair to the owner of the property and also establishes uniformity. The Court finds that the bankruptcy court's reliance on 28 U.S.C. § 1961 was an appropriate reference to determine the amount of interest. The bankruptcy court's order of January 7, 1985, is affirmed insofar as it denied the deletion of the prejudgment interest and denied a later date for the commencement of the interest. This Court takes note of Judge Paine's order of June 10, 1985, "[The Bankruptcy] court did not rely on any of the press releases, including the March 26, 1980 press release, in its determination relative to prejudgment interest. The bankruptcy court neither referred to nor utilized any of the information contained therein in reaching its decision." The June 10, 1985, order supplementing the record to include the press release of March 26, 1980, is affirmed since it reflects the interest rate designated by the formula for prejudgment interest chosen by the bankruptcy court in its Janu-

ary 7, 1985, order. The statutory post-judgment rate is the relevant factor used to determine the prejudgment interest rate in the case at bar. The record should not be supplemented to include the remainder of the press releases for 1980 since these do not fall within the realm of 28 U.S.C. § 1961(a) for the determination of interest.

An appropriate order will be entered.