## DATER et al. v. ANDERSON.

Circuit Court of Appeals, Sixth Circuit.
November 7, 1928.

No. 5018.

W. P. Harvey, of Benton Harbor, Mich. (Gore & Harvey, of Benton Harbor, Mich., on the brief), for appellants.

Rolland J. Cleland, of Grand Rapids, Mich. (Edward J. Bowman, of Grand Rapids, Mich., on the brief), for appellee.

Before DENISON, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This is an appeal from the final decree of the District Court granting relief to appellee, as trustee in bankruptcy, against appellants on account of certain alleged preferential transfers by the bankrupt within four months of bankruptcy. The facts material to the controversy, so far as presently important, are these:

Appellant Eleanor G. Gray owned a farm in Van Buren county, Mich. (known as the Olney Farm), consisting of 560 acres, with buildings. It was incumbered by a mortgage for $21,000, which she had given to one Dowland, trustee. September 5, 1917 she contracted in writing to sell this farm to Traver, the present bankrupt, for $53,000; the payment of the Dowland mortgage being a part of such contract price. Traver made a down payment of $10,000 on the purchase contract. The remaining $43,000 was payable, $2,000 or more on or before December 1st of each year thereafter, commencing December 1, 1919; the entire purchase price to be paid by December 1, 1927. Traver was also to pay seasonably all taxes and assessments on the farm, including taxes for 1918.

Aside from running the Olney Farm, Traver's business was largely the operation of canning factories. On March 29, 1918, less than 6½ months after he had contracted to buy the farm, Traver applied to appellant Humphrey S. Gray, husband of Eleanor G. Gray, to indorse his note, or at least help him get $10,000 from the American National Bank of Benton Harbor, Mich., of which bank Gray was president. The latter, on his wife's behalf, had negotiated the sale of the Olney Farm and looked after the business transactions connected therewith. Accordingly, under date of March 29, 1918, Mr. and Mrs. Traver assigned to Gray the Olney farm-purchase contract, and executed and delivered to Gray a chattel mortgage of $5,000 on the Olney Farm stock, machinery, and equipment, as well as a mortgage for $5,000 on Traver's manufacturing plant in Hartford, Mich.; the written contract between the three parties declaring that all the mortgages and transfers referred to were given to Gray to secure any and all indebtedness Traver might at any time, until such papers are canceled, "directly or indirectly owe Humphrey S. Gray or the American National Bank of Benton Harbor, Michigan; also to secure said Humphrey S. Gray for any indorsement upon or security given for any indebtedness of the said first part [Traver] to said bank." We print in the margin a further agreement contained in the contract.[1]

[1] "It being also agreed that if first party pays the indebtedness he owes or may, while these papers remain in force, owe said Humphrey S. Gray, and which he owes to him or the American National Bank, then all of the above mortgages and transfers shall be cancelled and returned to first party, but if at any time first party fails to pay any indebtedness he owes to said H. S. Gray or to said American National Bank, or any indebtedness for which the said H. S. Gray is security or indorser, or has given collateral, then second party may foreclose said mortgage or sell said contract and apply the net

All of these securities were given nearly three years before Traver's bankruptcy, which occurred February 6, 1922. According to the undisputed testimony, the real estate mortgage was surrendered in 1920. The chattel mortgage was apparently surrendered previous to bankruptcy. November 17, 1921, when Traver had become or was becoming financially embarrassed, he owed the American National Bank on loans $27,450, viz.: (a) On notes indorsed by Gray as surety $11,500; (b) two notes of $5,000 each indorsed by appellant Dater; (c) a note of $5,000 indorsed by J. M. Paver Company, and a note of $950 indorsed by one Clover. The Paver note was taken up by the indorsers. Dater was a director of the American National Bank and a member of a firm which was an unsecured creditor of Traver. At a creditors' meeting, on or about November 22, 1921, Dater was elected a voluntary trustee for creditors, and for a time served as such. On the last-named date Mr. and Mrs. Gray, by notice to Mr. and Mrs. Traver, and again on December 3, 1921, by notice to the same parties and to Dater, trustee, stated that "the undersigned" would declare the contract forfeited and would repossess herself of the land unless certain past-due payments were made within 20 days from the dates of the respective notices. On or about the last-named date, on Traver's statement that he could not hold the farm, it was agreed between Mr. and Mrs. Traver and Gray that the two former would surrender the contract to Gray and consider the matter closed (their son to have possession of the farm until spring for purposes of feeding stock), Gray agreeing not to file any claim against the estate by reason of his indorsement, and expressing himself as satisfied that Dater would not file for the $10,000 he had indorsed, and that "we would consider these two paid and neither one of us would file against his estate, and I took the contract back."

On January 4, 1922, no payments having meanwhile been made, Mrs. Gray gave final written notice to Mr. and Mrs. Traver, William Traver, Jr., and Dater, trustee, that the farm-purchase contract was terminated— permitting the parties to remain in possession from day to day without further notice, subject to Mrs. Gray's right at any time to ter- minate such possession and herself take possession. On January 1, 1922, the unpaid purchase price under the Gray-Traver contract was $39,778.40, or a trifle more than $19,000 above the precedent Dowland mortgage. The amount due the American National Bank on notes indorsed by Gray was $11,955, on notes indorsed by Dater $10,192.50. On January 5, 1922, Mrs. Gray conveyed the Olney Farm by warranty deed to Mr. Gray and Dater, subject to the underlying Dowland, trustee, mortgage. The testimony is undisputed that Dater at the time paid Mrs. Gray more than $9,000 for one-half her equity as of January 1, 1922. Gray later gave her some stock to clean up with her, and Gray and Dater each paid to the bank the Traver paper respectively indorsed by them; no claim therefor having been filed against the bankrupt estate. This deed was recorded February 9, 1923.[2]

Appellee's amended bill of complaint sought recovery against the three appellants of the value of Traver's contract interest in the Olney Farm, without deduction for the amount of either Gray's or Dater's indorsements, which were claimed by them to be secured by the assignment of March 29, 1918, before referred to, including the purchase contract for the Olney Farm, as well as the real estate mortgage and chattel mortgage hereinbefore mentioned.

The district judge found that no preference under the bankruptcy act was created as to the portion of the transfer in question represented by the unpaid balance of the purchase price of the farm, nor as to the amount due on notes to the bank indorsed by Gray. The judge was, however, of opinion that Dater was not secured by the assignment of March 29, 1918, and so awarded recovery against appellants for what he thought to be the value of the farm less (1) the net value of lessee's interest and (2) Gray's bank indorsements. The trustee in bankruptcy has not appealed.[3]

---

proceeds, first, on any and all indebtedness due said H. S. Gray, directly or indirectly, and to secure any endorsement made by him or collateral given by him to secure payment of any debt of W. M. Traver, and then on any and all indebtedness due from said first party to said bank, and the balance, if any, shall be returned to first party."

[2] Creditors' petition in bankruptcy was filed February 6, 1922. Four days later Traver consented to the adjudication, which was made March 2, 1922. Two days later Dater was appointed receiver in bankruptcy, and acted as such for 20 days. On March 15, 1922, bankrupt petitioned for adjudication in voluntary bankruptcy, and on March 27, 1922, appellee was appointed trustee in bankruptcy.

[3] Paragraph a of the decree below, dismissing the bill of complaint as against defendant Simpson Acres, later referred to; paragraph b, denying recovery of the value of the growing crops for 1922 and of rental value of the land for that year; and paragraph c, denying relief relative to recovery against Dater except to the extent stated therein—are acquiesced in by the bankruptcy trustee's failure to appeal, and are binding upon us.

The only substantial question before us thus relates to the correctness of the award to the trustee of the value of the farm above its unpaid purchase price and the amount of Gray's bank indorsements. Manifestly, this recovery is not sustainable unless Dater's indorsements were not secured by the assignment from Traver to Gray of March 29, 1918, nor even then, unless the value of the farm was such as to leave a surplus above the two prior liens.

Granting that Traver was insolvent in January, 1922, when the actual conveyance to Gray and Dater was made, and that appellants were chargeable with notice of the fact, and that they actually obtained through the transactions stated under the security of March 29, 1918, a preference over unsecured creditors, such preference was, under the Bankruptcy Act (11 USCA) entirely lawful to the extent of the actual securities assigned March 29, 1918.

We think the district judge erred in the conclusion that the assignment last stated did not secure Dater's indorsements nor loans made by the bank on notes secured by the indorsements of others than Humphrey S. Gray. The language of the assignment *expressly* covers *all* Traver's indebtedness to the bank then or thereafter existing, and, in natural and necessary effect, whether or not indorsed by others. Indeed, we do not understand that it appears that Dater was an indorser for Traver at the bank when the assignment of March 29, 1918, was given.

We are not impressed by the suggestion that the assignment was not procured by Gray in "his official capacity" as president, but that he was acting personally. The fact remains that he *was president* of the bank, and that he lawfully might, and that it was eminently proper that he should, see that the bank was secured with respect to Traver's indebtedness to it, toward which, in view of his personal relations with Traver, Gray stood in at least a quasi fiduciary relation. Not to have looked out for the bank at a time when he was looking out for himself might well call for serious explanation; for we cannot agree with the proposition that Gray's relations to the bank were the same as those of an indorser not interested in the bank from which a loan is made.

But this consideration apart, under the well-settled rule that one for whose benefit a promise is made may enforce it in equity, even if not at law (Princess Amusement Co. v. Wells [C. C. A. 6] 271 F. 226, 229, certiorari denied, 256 U. S. 701, 42 S. Ct. 623, 65 L. Ed. 1178), the bank would have had the right to resort to the security agreement. This suit is in equity. True, the bank has had no occasion to resort to the security agreement because Dater, the indorser, took up the paper. In its last analysis, the concrete situation is this: Traver, the original debtor, whose duty it has always primarily been to pay the debt, gave the bank security for its payment; the bank has received its pay from Dater, the indorser, and because of his indorsement.

We find nothing connected with the surrender by Mr. and Mrs. Traver of their contract equity on or about December 3, 1921, amounting, legally or equitably, to a payment by Traver of the bank notes indorsed by Dater, or precluding the bank from enforcing the security if Dater had not paid the notes he had indorsed.

We think that on plain principles of equity Dater is entitled to be subrogated to the security held by the bank. Belknap Co. v. Ohio Co. (C. C. A. 6) 271 F. 144, 147; Maryland Co. v. Repass (C. C. A. 4) 253 F. 328, 331; Massachusetts Co. v. Chouteau (C. C. A. 8) 264 F. 793, 797. Dater paid, not a fraction, but the entire debt for which he was liable as surety. See Columbia Co. v. Kentucky Union (C. C. A. 6) 60 F. 794. We do not understand that the bank is making any claim to the fund in question. The question of priority is solely between Dater and the trustee in bankruptcy, whose rights are no greater than those of Traver.

Nor do we see any equity in favor of the trustee in the fact that Traver surrendered to Gray and Dater an interest allegedly belonging to Traver's creditors—due to the fact that the right of redemption was not formally cut off. We think that the utmost effect of any invalidity of Gray's notices of forfeiture, and Traver's surrender and Mrs. Gray's deed, was to make Gray and Dater owners of the fee subject to the land contract, and this would give the bankruptcy trustee only a right to redeem within some reasonable time. This right was given to him by universal consent during the entire year 1922. After the bankruptcy trustee's appointment, he was also allowed to try to find a purchaser, with full right to have for the estate whatever surplus he could save. The highest final offer he had was $65,000, which he seems to have thought would leave nothing for Traver's equity. At the public sale, no bid was offered for the equity. In January, 1923, Gray and Dater sold so as merely to get their money out. We cannot see how this effected a fraud upon creditors. The

948

bankruptcy trustee, with knowledge that the legal title had been in terms declared forfeited, and that Gray and Dater claimed the full legal title, indicated no dissatisfaction with the equity which they were offering, viz., anything which could be saved for the estate above their debts. Under these circumstances, lack of any formal foreclosure making the bankruptcy trustee a party furnished no basis for charging Gray and Dater with a transfer in fraud of creditors.

■ The only remaining question is whether, after allowing Dater's priority in the assigned security, anything remains for the trustee. We think this question must be answered in the negative. The district judge fixed the fair value of the farm at $65,000. No higher valuation could safely be made. Gray and Dater not only made no conversion, but did not deprive the trustee of his possible equity until January, 1923. If the land contract was not cut off by the deal in January, 1922, then matters stood as they were, and interest continued to run until January 30, 1923, when they sold. Computing interest until that date upon the purchase price and Gray and Dater's indorsed bank paper, the total seems to be more than $65,000. They had this farm; the Fridays had an equity in a Chicago apartment building; and Simpson saw prospects in that building. Gray and Dater traded with Friday, selling him the farm and taking the Chicago equity; and, as a part of the same transaction, they sold the Chicago equity to Simpson and took in exchange from him a purchase-money third mortgage on the apartment building. They charged Simpson the exact amount of their secured debts against the farm, figured up to that time, plus the $950 note at the bank, which was also secured by the assignment, and which they would in this way collect for the bank, if Simpson ever paid. Simpson also paid them some farm rentals for 1922, and the debt on that account seems to have been satisfied by the deal. They seem to have given Simpson the benefit of the purchase price as if he had purchased the year before, when he took the lease, but to have computed their own interest up to the date of the purchase. It is undisputed that, when the testimony was taken, they had paid out over $50,000 to protect their equity, and had received nothing back.

We fail to see any valid ground of complaint by the bankruptcy trustee. It follows that the decree of the District Court should be reversed, and the record remanded to that court with directions to dismiss the bill of complaint.