**In the Matter of FOREMAN INDUSTRIES, INC., Debtor.**

**FOREMAN INDUSTRIES, INC., Plaintiff,**

v.

**BROADWAY SAND & GRAVEL, Defendant.**

Bankruptcy No. 3–81–03005.
Adv. No. 3–83–0582.

United States Bankruptcy Court,
S.D. Ohio, W.D.

March 24, 1986.

Bruce A. Buren, and Thomas R. Noland, Altick and Corwin, Dayton, Ohio, for plaintiff/co-counsel for Official Creditors' Committee.

Ronald D. Keener, New Lebanon, Ohio, for defendant.

R.C. Gibbs, Cunningham, Gibbs & Cavalieri, L.P.A., Columbus, Ohio, for debtor.

## DECISION GRANTING PLAINTIFF'S COMPLAINT TO RECOVER PREFERENTIAL TRANSFER

THOMAS F. WALDRON, Bankruptcy Judge.

This is a case arising under 28 U.S.C. § 1334(a) and having been referred to this court is determined to be a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (F), in which the plaintiff-debtor, Foreman Indus-

tries, Inc., seeks to recover as a preference money paid to the defendant, Broadway Sand & Gravel. This matter is before the court on plaintiff's complaint, defendant's answer, the joint pretrial statement of plaintiff and defendant, the evidence presented at the trial, and the post-trial briefs of the plaintiff and the defendant.

The parties agreed to a jointly filed stipulation which established the following facts:

1. This court has jurisdiction over this proceeding;

2. The date the Order of Relief was entered is October 13, 1981 (pursuant to an Order of this court dated February 16, 1983, consolidating a voluntary petition under Chapter 11, with an involuntary petition under Chapter 7, Title 11, U.S.C.);

3. The applicable law governing preferential transfers is 11 U.S.C. § 547;[1]

4. On or before June 25, 1981, the defendant sold goods to the plaintiff totaling $845.87, under invoice Nos. 29529, 29601 and 29702, dated June 19, June 22 and June 25, 1981, respectively; and

5. It was the usual course of business between the plaintiff and the defendant for the plaintiff to pay the defendant for materials and supplies and for the defendant to receive payment within sixty (60) days of the date of its invoice.

The parties further agreed during the trial that the check for $845.87 was issued by the plaintiff, Foreman Industries, Inc., to the defendant, Broadway Sand & Gravel, on August 5, 1981, and honored by the bank on August 16, 1981.

The parties disagree as to whether August 5 or August 16, 1981, is the date on which the alleged preferential transfer of funds took place. Also the defendant disagrees that the plaintiff was insolvent on the date of the transfer under 11 U.S.C. § 547(b)(3), whether that date was August 5 or August 16, 1981. Finally, the defendant disagrees, even assuming the plaintiff

was insolvent, that the transfer would be deemed preferential because it falls within the exceptions provided by 11 U.S.C. § 547(c)(1) or (c)(2). The defendant does not dispute, however, that the plaintiff has met his burden of proof with respect to § 547(b)(1), (2), (4) and (5).

The court sets forth its findings of fact and conclusions of law at this point to provide a guide for the balance of this decision:

1. July 15 to October 13, 1981 was the preference period under 11 U.S.C. § 547(b)(4);

2. August 16, 1981, the date the bank honored the check issued by the plaintiff to the defendant, was the date of the transfer for purposes of 11 U.S.C. §§ 547(b), (c)(1) and (c)(2);

3. June 19, June 22 and June 25, 1981, the dates of defendant's invoices to the plaintiff, were the dates of delivery of the goods and the dates on which the debts were incurred for purposes of 11 U.S.C. § 547(c)(2)(B);

4. The plaintiff was insolvent on August 16, 1981, and throughout the entire preference period;

5. The plaintiff established a preferential transfer under 11 U.S.C. § 547(b) in the amount of $845.87; and

6. The defendant did not establish an exception under 11 U.S.C. § 547(c)(1) or (c)(2).

## I. PREFERENTIAL TRANSFER UNDER 11 U.S.C. § 547(b)

### A. Date Of Transfer Under § 547(b)

In order for a transfer to be found preferential, the plaintiff must establish by a preponderance of the evidence the following five elements:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

---

1. Unless otherwise noted, all references to provisions of Title 11 of the Bankruptcy Code are to the statutes in effect as of the date of the filing of this petition and can be found in 11 U.S.C. (Supp. V 1981).

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). *Sportfame of Ohio, Inc. v. Wilson Sporting Goods Co. (In re Sportfame of Ohio, Inc.)*, 40 B.R. 47, 54 (Bankr.N.D.Ohio 1984); *Hunter v. S.K. Austin Co. (In re Beck)*, 25 B.R. 947, 951 (Bankr.N.D.Ohio 1982).

▉ Preliminary to establishing these five elements, however, is the determination of the date the transfer occurred for purposes of 11 U.S.C. § 547(b). Plaintiff argues the transfer occurred on August 16, 1981, the date the bank honored its check to the defendant. The defendant argues the transfer occurred on August 5, 1981, the date the plaintiff wrote the check. The majority of courts would agree with the plaintiff's position, as they "have held that the debtor transfers no property, *within the meaning of section 547(b)*, when he issues his own check. As under old section 60, the transfer occurs when and if the drawee bank honors the check" (emphasis in original; footnotes omitted). Countryman, *The Concept of a Voidable Prefer-*ence *in Bankruptcy*, 38 Vand.L.Rev. 713, 761 (1985). *See, e.g., Klein v. Tabatchnick*, 610 F.2d 1043 (2d Cir.1979); *Ducker v. The Isaac Building Corporation (In re Bridges Enterprises, Inc.)*, 44 B.R. 979 (Bankr.S.D.Ohio 1984); *Remes v. Acme Carton Corporation (In re Fasano/Harriss Pie Company)*, 43 B.R. 871 (Bankr.W.D.Mi.1984). The rationale for this view is that the check does not operate as an assignment of funds; it is merely an order to pay on demand. *Klein*, 610 F.2d at 1049. Professor Countryman notes that this rationale arises out of an interpretation of Uniform Commercial Code §§ 3–409(1), 3–413(2) and 4–402 which provide that liability runs to the drawer under his contingent promise to pay the creditor if the drawee bank does not. Countryman, *supra* at 761–62. This reasoning comports with Ohio law, which provides that a check is deemed paid when the "process of posting" as defined under § 1304.01(A)(18) is completed or the check is paid in cash. OHIO REV.CODE ANN. § 1304.19(A) [U.C.C. § 4–213] (Page 1979); *In re Bridges Enterprises, Inc.* at 982. Furthermore, until a check is honored by the drawee bank, not only can a third person acquire rights superior to those of a payee, but the drawer can stop payment. *Grogan v. Chesebrough-Ponds, Inc. (In re Advance Glove Manufacturing Co.)* 25 B.R. 521, 524–25 (Bankr.E.D.Mich.1982). Accordingly, the date of the transfer for purposes of 11 U.S.C. § 547(b) is August 16, 1981.

## B. Debtor's Insolvency Under § 547(b)(3)

▉ Having met its burden of proof in establishing that the transfer was "to or for the benefit of the creditor;" that it was "for or on account of an antecedent debt owed by the debtor before such transfer was made;" that it was made "on or within 90 days before the date of the filing of the petition;" and that it enabled the creditor to receive more than he would if "(A) the case were a case under Chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such

debt to the extent provided by the provisions of this title," § 547(b)(1), (2), (4) and (5), the plaintiff must establish that the transfer on August 16, 1981, was "made while the debtor was insolvent." § 547(b)(3). The debtor is aided in his proof by 11 U.S.C. § 547(f) which provided: "For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." *See also Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1351 (8th Cir.1983). "Insolvent" means:

> (A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
>> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and
>> (ii) property that may be exempted from property of the estate under section 522 of this title;

11 U.S.C. § 101(26) (Supp.V.1981); *cf.* § 101(29) following the Bankruptcy Amendments and Federal Judgeship Act of 1984. Insolvency then is essentially a balance sheet test: that is, a debtor is insolvent when the debtor's liabilities exceed the debtor's assets, excluding the value of preferences, fraudulent conveyances and exemptions. Although couched as a legal concept, it is basically a factual determination, *Briden v. Foley,* 776 F.2d 379, 382 (1st Cir.1985); *Clay* at 1350, for which "the ultimate burden of persuasion" still rests with the plaintiff. *Clay* at 1351. The parties have stipulated to plaintiff's exhibit 4 "Summary of debts and property (From the statements of the debtor in Schedules A and B)" which was signed on November 24, 1981 by Jon G. Mills, and showed that on November 24, 1981, the plaintiff had $18,790,701.84 in liabilities and $17,917,981.01 in assets. At the trial, Jon Gary Mills, testified that he has been President of plaintiff corporation since September 30, 1981, and had been its General Manager at the time the bankruptcy petition was filed (Tr. 22). He testified that the business

ceased operating on October 4, 1981, when the bank, which had been extending credit based on the debtor's receipts from accounts receivable, refused to extend any further credit. The bank's action followed a period beginning in July 1981 when numerous checks were dishonored for nonsufficient funds (Tr. 34–37, 43). The plaintiff was attempting to operate on accounts receivable financing. The accounts receivable included a substantial amount due from General Motors (Tr. 25). The accounts receivable were included at their full amount as assets of the debtor; but, in fact, a major portion were not being paid at their full amount, including payment being withheld by General Motors (Tr. 25, 37, 40, 43). In addition to other claims, the debtor had a tax debt of $2 million, a substantial amount of which was delinquent throughout the preference period (Tr. 42).

■ The only evidence offered by the defendant at the trial to rebut the presumption of insolvency and the evidence presented by the plaintiff was the defendant's cross-examination of Mr. Mills. The defendant's attorney focused on August 5, 1981, the date claimed by the defendant as the date of the transfer. Mr. Mills testified that in his opinion on August 5, 1981, if General Motors had paid the plaintiff the amount of accounts receivable that had been invoiced by the plaintiff, the plaintiff would have had more assets than liabilities and would still be operating (Tr. 47–48). Mr. Mills qualified this opinion by acknowledging that he was not an accountant and could not give an accountant's balance sheet analysis of the firm's financial status on any particular day (Tr. 48–49), nor could he state an amount by which the assets exceeded the liabilities (Tr. 39).

The weight to be given to Mr. Mills' opinion is further diminished by the fact that the amount of the accounts receivable referred to by him, rather than being available for full payment, was being contested, specifically by General Motors (Tr. 25). Accordingly, Mr. Mills' testimony on this matter, though honest, is inconclusive and unpersuasive since it was premised on a

going concern valuation of a business which was not operating and assigned a valuation to the accounts receivable which was neither received nor available at the time in issue. *Sandoz v. Fred Wilson Drilling Company (In re Emerald Oil Co.)*, 695 F.2d 833, 835 (5th Cir.1983). As Mr. Mills testified, if General Motors had paid the debtor on August 5, 1981, what the debtor ultimately received from General Motors, that $7,000,000 payment, which was approximately one or two million dollars less than what was listed on the books (Tr. 38), may well have allowed the debtor to "still be operating" (Tr. 48), but that would have been as a result of a massive influx of cash which would have allowed the debtor access to further lending sources, not because on a balance sheet test of insolvency the debtor's assets exceeded its liabilities at a fair valuation.

Mr. Mills' testimony did establish, however, that for a period beginning in July of 1981 through October 13, 1981, the date the petition was filed, the company was unable to pay its current obligations; its checks were being returned for nonsufficient funds; it owed some $2 million in delinquent taxes; its prior lending sources and remaining line of credit had been exhausted; its assets did not exceed its liabilities and, in fact, the company was insolvent under any acceptable definition of the word.

The court, therefore, finds that the defendant did not successfully rebut the presumption of insolvency and to the extent the testimony elicited from Mr. Mills on cross-examination challenged the presumption, the additional evidence of insolvency presented by the plaintiff satisfies the debtor's ultimate burden of proof on the issue of insolvency. *In re Emerald Oil Co.* at 837–38, *Gilbert v. Baker (In re Brooks)*, 44 B.R. 963 (Bankr.S.D.Ohio 1984). The plaintiff's evidence was sufficient for the court to retroject the debtor's insolvent condition from the time its petition was filed to ninety (90) days before. *Briden* at 382; *Kanasky v. Randolph (In re R. Purbeck & Associates, Ltd.)*, 27 B.R. 953, 955 (Bankr.D.Conn.1983). The plaintiff having met its burden of proof by a preponderence of the evidence, the court finds the transfer preferential and, therefore, avoidable under 11 U.S.C. § 547(b).

## II. EXCEPTIONS TO PREFERENTIAL TRANSFER—11 U.S.C. § 547(c)(1), (c)(2)

### A. Date Of Transfer Under § 547(c)

The defendant maintains that even if the transfer met all the requirements of 11 U.S.C. § 547(b), nevertheless it cannot be avoided because it falls within the exceptions provided by 11 U.S.C. § 547(c)(1) and/or (c)(2). These sections provided that:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;

Prefatory to whether the defendant has met the so-called contemporaneous exchange ((c)(1)) or ordinary course of business ((c)(2)) exceptions is the question of when the "transfer" occurred. This is a difficult question to which courts have provided different answers based in large measure on the weight to be accorded legislative materials concerning these exceptions. Countryman, *supra* at 760–65. The House Committee Report to § 547(c)(1) states:

The first exception is for a transfer that was intended by all parties to be a contemporaneous exchange for new value, and was in fact substantially contemporaneous. Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous." and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6329. Professor Countryman concludes that the Committee misinterpreted the significance of the 30–day period provided by U.C.C. § 3–503(2). He contends it "has nothing to do with whether the underlying transaction is a credit transaction," but relates instead to the contractual obligation between the drawee bank and the drawer. Countryman, *supra* at 761. Furthermore,

When the floor managers of the bill later attempted to clear up the confusion created by the Committee Reports, they only compounded it and extended it also to section 547(c)(2): "Contrary to language contained in the House Report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2)" (footnotes omitted).

*Id.* (quoting legislative debates 124 Cong. Rec. 32,400 (statement of Rep. Edwards) and 34,000 (statement of Sen. De Concini) (1978)).

The result of this confusion is summarized in *In re Fasano/Harriss Pie Company* at 874–75, where the court identifies three judicial approaches to the problem. One line of cases holds that a transfer by a check occurs for purposes of § 547(c)(1) and (c)(2) on the date of delivery of the check. *E.g., O'Neill v. Nestle Libbys P.R.,*

*Inc.,* 729 F.2d 35 (1st Cir.1984). These decisions generally rely on the identical statements of Sen. De Concini and Rep. Edwards quoted above, and the public policy of encouraging "trade creditors to continue dealing with troubled businesses by insulating normal business transactions from the trustee's avoiding power." *In re Fasano/Harriss Pie Company* at 875.

"The second line of cases views § 547(c)(2) as controlling ... Under this approach, a relation back to the date of delivery is required only if the check is honored within ten (10) days of its delivery" (citations omitted). *Id.*

The third line of cases views the absence of legislative history on paragraph (c)(2) "as persuasive evidence of Congressional intent" and concludes that "if Congress had intended to treat a check for the purpose of section 547(c)(2) other than as a credit transaction, it would have so stated." *Id.* (quoting *In re Advance Glove Manufacturing Co.* at 527).

We decline to follow the first line of cases believing they are at odds with an overriding principle of placing creditors at parity in bankruptcy proceedings and are grounded on language contained in the legislative debates which has been characterized as "inadvertent, gratuitous and unintentional." *In re Advance Glove Manufacturing Co.* at 527. Furthermore,

If a check constituted payment when delivered, debtors and creditors would be in a position to enter into collusive and fraudulent agreements to frustrate "the prime bankruptcy policy of equality of distribution among creditors of the debtor." H.R.Rep. No. 595, 95th Cong., 1st Sess. 178 (1977), U.S.Code Cong. & Admin.News 1978, p. 6138. A debtor in financial difficulty could deliver checks to favored creditors within the time prescribed by section 547(c)(2), but subject to an understanding that the checks would not be cashed for a specified period of time or until advised to do so by the debtor. The creditors could then cash the checks on the eve of bankruptcy free from attack by the trustee, even

though the check was not intended to satisfy the existing obligation when delivered. It is inconceivable that Congress would have knowingly enacted bankruptcy legislation inviting such conduct (footnotes omitted).

*Id.* at 528–29.

We find the second line of cases inapplicable because we must follow the Sixth Circuit's ruling that Congress granted security interests specialized treatment under §§ 547(c)(3) and (e), thereby differentiating them from unsecured transfers. *Ray v. Security Mutual Finance Corporation (In re Arnett)*, 731 F.2d 358 (6th Cir.1984).

We find the rationale of the third line of cases persuasive, and conclude that if Congress had intended a transfer to be treated differently under § 547(b) than under § 547(c), it would have made its intention clear in the language of the statute itself, just as it did when it separated issues concerning secured transactions.

> Not all legislative materials are to be accorded the same weight in determining legislative intent.
>
> . . . .
>
> Section 547 embodies a fundamental concept of bankruptcy legislation. It is not to be negated by a solitary, unexplained reference hidden in the Congressional Record—a reference made under circumstances which, for all practical purposes, deprived the Senate and the House of an opportunity to study and to reflect on its implications. If Congress had intended to make a basic change in the preference concept, it is not unreasonable to assume that such an intention would have been clearly and unambiguously expressed (footnote omitted).

*In re Advance Glove Manufacturing Co.* at 528.

Accordingly, the court finds the transfer in question occurred on August 16, 1981, the date the check was honored for purposes of § 547(c)(1) and (c)(2), as well as for § 547(b).

The next issue to be considered is whether the transfer on August 16, 1981 is excepted from avoidance because it meets the elements set forth in § 547(c)(1) and/or (c)(2).

**B. Exception Pursuant To § 547(c)(1)**

Section 547(c)(1) provided:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

The purpose of the exception provided in § 547(c)(1) as evidenced by the statutory language "contemporaneous exchange for new value given" is to exclude from the category of preferences those transfers which are essentially simultaneous, allowing only for a check to be substituted for cash. This is in contrast to a situation involving an antecedent debt under § 547(b). *In re Arnett* at 361. This purpose is further emphasized in clause (2) which required a physical element: "the exchange must *in fact* be contemporaneous" (emphasis in original). *Id.* at 362. *See also Butz v. Pingel (In re Pingel)*, 17 B.R. 236 (Bankr.S.D.Ohio 1982).

The evidence before the court shows that the transfer of $845.87, regardless of the fact that it was in the form of a check, was not contemporaneous, but was for an antecedent debt. The defendant delivered the goods on June 19, June 22 and June 25, and invoices were prepared that same day (Exh.3). At the trial, George V. Jones, Vice President of defendant Broadway Sand & Gravel, testified that the company considered the money owing to it upon delivery of the goods. He testified that where large industrial jobs are involved, as in the instant case, the company runs an account, so that in the beginning of July, the debtor would have been billed for the three June deliveries and then given additional time to pay—30 to 60 days being typical (Tr. 54, 59–60). In actuality, the

plaintiff received the bill on July 2, and wrote its check on August 5; the defendant received the check on August 11 and deposited it on August 13, 1981, all within the usual time-frame for payment. That it was within the customary pattern of transactions between the parties does not, however, make it a contemporaneous exchange under the statute. The defendant bears the burden of proving that the transfer was contemporaneous. *In re Fasano/Harriss Pie Company* at 877. That burden was not met as no evidence was submitted to show that it was the intention of both the debtor and the creditor that the transfer was contemporaneous. *Id.* Nor was any evidence offered to show that the plaintiff's and the defendant's conduct supported such a conclusion:

> If the sole test is the intention of the parties as required in 11 U.S.C. § 547(c)(1)(A), then it would be necessary for the Court to conduct extensive factual inquiries into situations which would lend themselves to collusion and the fabrication of evidence, and perhaps render the preference section inoperable against all but the most flagrant violations. The purpose of adding the requirement of 11 U.S.C. § 547(c)(1)(B) is to avoid the inherent evidentiary difficulties of 11 U.S.C. § 547(c)(1)(A) by requiring that the parties' conduct bears out their alleged intentions.

*In re Pingel* at 238–39.

Accordingly, the court finds that the check was not a contemporaneous exchange, but payment for an antecedent debt covering sand and gravel delivered in prior months. *Rovzar v. Prime Leather Finishes Co. (In re Saco Local Development Corp.)*, 10 B.C.D. 962, 963, 30 B.R. 859 (Bankr.D.Me.1983).

**C. Exception Pursuant To § 547(c)(2)**

The court next considers the exception provided in § 547(c)(2):

> (c) The trustee may not avoid under this section a transfer—
> ....
> (2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;

In order to be entitled to this exception, the defendant has the burden of proving that all four elements have been met. *In re Sportfame of Ohio, Inc.*, 40 B.R. at 55; *Belfance v. Banc Ohio/National Bank (In re McCormick)*, 6 B.C.D. 889, 891, 5 B.R. 726 (Bankr.N.D.Ohio 1980).

The defendant claims all four elements have been met. The plaintiff asserts that at least one element has not been met—§ 547(c)(2)(B)—and that no further argument is necessary. The plaintiff contends that more than 45 days elapsed between the date the debt was incurred and the date of transfer of the check. The plaintiff argues the dates the debts were incurred were June 19, June 22 and June 25, 1981, the dates the goods were delivered, and the date of transfer was August 16, 1981, the date the check was honored.

The defendant contends that 45 days did not elapse between the dates the debts were incurred and the date of transfer. The defendant asserts in its brief that June 29, 1981, was the billing date covering the three shipments and that the debt was not incurred until the defendant billed the plaintiff; the defendant contends that August 11, 1981, the date the check was delivered to it for payment was the date of the transfer. The court notes, however, that at trial, defendant's witness, George V. Jones, testified that he considered the amount owed as soon as the goods were delivered to the plaintiff despite the fact that the plaintiff was not billed until the end of the month (Tr. 68–69).

 Regardless of the discrepancy between the testimony at the trial and the

argument propounded in defendant's brief, the majority view is that the exception provided at § 547(c)(2) only applies when payment is received within 45 days after the debtor first becomes legally bound to pay, and that in the case of a sale of goods, delivery of those goods creates the obligation to pay. *See e.g., In re Emerald Oil Co.*, 695 F.2d at 837; *Barash v. Public Finance Corporation*, 658 F.2d 504, 511 (7th Cir.1981); *Nordberg v. Wilcafe (In re Chase & Sandborn Corp.)*, 51 B.R. 736, 738 (Bankr.S.D.Fla.1985); *Harris v. Glo-International Corporation (In re Handsco Distributing, Inc.)*, 51 B.R. 700, 702 (Bankr.S.D.Ohio 1985); *In re Sportfame of Ohio Inc.*, 40 B.R. at 55–56; *The Richter & Phillips Jewelers & Distributors, Inc. v. Dolly Toy Company (In re The Richter & Phillips Jewelers & Distributors, Inc.)*, 31 B.R. 512, 515 (Bankr.S.D.Ohio 1983); *In re Saco Local Development Corp.*, 10 B.C.D. at 963, 30 B.R. 859; *In re Advance Glove Manufacturing Co.*, 25 B.R. at 524. The rationale behind this view has been explained by Richard B. Levin, a member of the House Judiciary Committee staff which drafted the Code:

> The second exception to the preference section insulates ordinary trade credit transactions that are kept current. The requirements of the exception are that the incurring of the credit and the payment both be made in the ordinary course of business of the debtor and the creditor, that the transaction be according to ordinary business terms, and that the debtor's payment to the creditor be made not later than 45 days after the debt was incurred.

> Forty-five days was selected as a normal trade credit cycle. For example, a normal trade credit transaction might be as follows: supplier ships goods during month 1 and sends his bill to the debtor at the end of the month or the very early part of the following month. Normally, that bill would become due, or will be payable in the debtor's ordinary course of business, by the 10th of month 2. If it is paid by the 15th, then there will be no question that the entire transaction—incurring of the credit and the payment—took place within 45 days.

> Congress has not defined when a debt is incurred. In the preceding example, of course, there is no question. However, if the supplier's bill were paid toward the end of month 2, the supplier/creditor might argue that the debt was not incurred until the invoice was sent, thus bringing the payment within the 45-day period. Congress's intent seems to be to the contrary. For the purposes of this exception, the debt is incurred when it becomes a legally binding obligation on the debtor. Thus, when the goods are shipped, the debtor becomes liable for the payment, and the debt is incurred. . This is supported by Congress's selection of the 45-day period: Congress treated as nonpreferential an ordinary-course payment of trade credit in the first 15 days of the month following the month in which the goods were shipped or services performed. Payments later than the 15th are often late payments and an indication of financial trouble (footnote omitted).

Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am.Bankr.L.J. 173, 186–87 (1979). *See also In re McCormick*, 6 B.C.D. at 891–92, 5 B.R. 726. A debt becomes a legally binding obligation whenever a creditor has a right to payment. *See In re Bridges Enterprises, Inc.*, 44 B.R. at 984 (analyzing 11 U.S.C. § 101(11) "debt" and § 101(4) "claim").

Accordingly, the court finds that the debts were incurred on the dates of delivery—June 19, June 22 and June 25, 1981. The date of transfer was previously found to be the date the check was honored, August 16, 1981. Since more than 45 days elapsed between the dates the debts were incurred and the date of the transfer, the defendant cannot claim the ordinary business exception provided at § 547(c)(2). The transfer, therefore, was preferential and can be avoided by the plaintiff.

## III. PREJUDGMENT INTEREST

The remaining issue presented to the court is the plaintiff's request that it is

entitled to prejudgment interest from the date of filing its complaint. There is no specific provision in the Bankruptcy Code or Rules that addresses this subject. The issues of under what circumstances, beginning with what date and at what rate, to award prejudgment interest have been developed through judicial decisions.

When society abandoned a barter system that demanded the contemporaneous exchange of goods and services and accepted a promise of future payment based on an extension of present credit, it aided the conception of an embryo that would be born as bankruptcy. At the same time society created a requirement that the respective rights and interests of the parties affected by a bankruptcy be addressed in a fair and equitable manner.

A bankruptcy system that failed to examine a debtor's prefiling transfers of property would, at a minimum, be incomplete, if not unfair. Such a system would allow a debtor to receive the benefit of a societal cancellation of liabilities without any concomitant duty for a societal accounting of assets. The debtor alone would determine which creditors, if any, would receive what amount of the debtor's property, and only after the debtor had made such transfers and filed bankruptcy would other creditors be able to share in any remaining property. For this obvious reason, among other sound policy considerations, Congress has required that a debtor disclose information concerning certain prefiling transfers and further has authorized the recovery of such transfers by the debtor's estate so that payment of the debtor's liabilities can be accomplished in accordance with Congress' determination concerning distribution of a debtor's assets. The conceptual underpinning of Congress' determination of distribution has been expressed in one text as "what may fairly be regarded as the primary aim of bankruptcy legislation—an equitable distribution of the debtor's assets to his creditors." 3 *Collier On Bankruptcy* ¶ 507.02[1], at 507–15 (15th ed. 1985).

Accordingly, it is necessary to recognize that if litigation to recover a prefiling transfer is successful, recovering only the amount originally transferred is not adequate. Not only would the one creditor have received one hundred per cent (100%) of the amount owed by the debtor, but the creditor would also have had total control and use of the property transferred, including the opportunity to simply invest the amount in question until any litigation concerning the transfer was concluded—a situation which would not be true for other creditors. At the same time, the debtor's estate would have been deprived not only of the property transferred, to which it was rightfully entitled, but also the control and use of the property, particularly for investment purposes. In such a situation, all creditors and claimants of the estate would have had the amount they were entitled to receive diminished not merely by the wrongful transfer of the funds, but also by the continued retention of those funds. The wrongful retention of those funds can be redressed by an award of prejudgment interest. The awarding of prejudgment interest is compensatory. It compensates the debtor's entire estate for the use of those funds for the period of time that they were wrongfully withheld from the estate. *Manufacturers' Finance Co. v. Marks*, 142 F.2d 521, 528 (6th Cir.1944), *cert. denied*, 323 U.S. 721, 65 S.Ct. 52, 89 L.Ed. 579 (1944); *Merrill v. Abbott (In re Independent Clearing House Company)*, 41 B.R. 985, 1015 (Bankr.D.Utah 1984).

■ There is a lengthy history of judicial decisions supporting the awarding of prejudgment interest in preference actions. *E.g., Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Palmer v. Radio Corporation of America*, 453 F.2d 1133, 1140 (5th Cir.1971); *Manufacturers' Finance Co. v. Marks*, 142 F.2d at 528; *Anderson v. Dater*, 18 F.2d 987, 991 (6th Cir.1926), *rev'd on other grounds*, 28 F.2d 944 (6th Cir.1928); *Becker v. Security National Bank (In re Four Seasons Sporting Goods, Inc.)*, 46 B.R. 528,

530 (Bankr.N.D.Cal.1985); *In re Independent Clearing House Company,* 41 B.R. at 1015; 3 *Collier On Bankruptcy* ¶ 60.63[1], at 1129 (14th ed. 1977). Although the parties' pretrial statement refers to correspondence in July and December of 1982 requesting payment, no such correspondence or other evidence was introduced in this proceeding, and where no demand for payment had been made prior to the commencement of the case, the filing of the complaint constitutes such a demand, and interest is to run therefrom. *E.g., Kaufman v. Tredway,* 195 U.S. at 273, 25 S.Ct. at 34; *White Co. v. Wells,* 42 F.2d 460 (6th Cir.1930); *Elliotte v. American Sav. Bank & Trust Co.,* 18 F.2d 460, 462 (6th Cir. 1927); *In re Four Seasons Sporting Goods, Inc.,* 46 B.R. at 530–31; *In re Independent Clearing House Company,* 41 B.R. at 1015; 3 *Collier On Bankruptcy, supra.*

The final matter for determination by this court is what rate of interest constitutes fair compensation for the estate's deprivation of the use of the property transferred and withheld. Although the Sixth Circuit Court of Appeals has not specifically addressed this issue in the context of a preference action (the cases simply order interest, but are usually silent on the rate to be applied), its general policy in non-bankruptcy cases involving a federal question where the statute is silent on the issue of interest is to uphold the trial court's discretion, in the absence of an abuse of that discretion. *Newman v. Grand Trunk Western Railroad Company,* 781 F.2d 55, 56 (6th Cir.1985) (involving the Federal Employers' Liability Act); *Equal Employment Opportunity Commission v. Wooster Brush Company Employees Relief Association,* 727 F.2d 566, 579 (6th Cir.1984) (hereinafter *EEOC v. Wooster*) (involving Title VII of the Civil Rights Act, as amended by the Pregnancy Discrimination Act of 1978); *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988, 990 (6th Cir.1982) (involving the Labor Management Relations Act of 1947 and the Employment Retirement Income Security Act of 1974).

The legislative history behind the recent amendment to 28 U.S.C. § 1961 indicates that Congress favors the awarding of prejudgment interest in a federal court where the circumstances warrant and attempts to do so fairly by considering the everchanging costs of borrowing money.

Under current law, the interest rate granted on judgments during appeal is based on varying State laws and frequently falls below the contemporary cost of money. As a consequence, a losing defendant may have an economic incentive to appeal a judgment solely in order to retain his money and accumulate interest on it at the commercial rate during the pendency of the appeal.

Section 302 amends 28 U.S.C. 1961 by setting a realistic and national rate of interest on judgments in the Federal courts. The provision would tie the post-judgment interest rate to the rate used by the Internal Revenue Service for delinquent taxes under 26 U.S.C. 6621. That rate is a composite of prime rates from throughout the country that is reviewed and revised periodically. Furthermore, by consolidating all the provisions for interest on judgments of Title 28 into this section, this rate becomes uniformly applicable to all litigation in the Federal courts.

There are presently no generally applicable guidelines concerning the award of prejudgment interest by Federal courts. Yet such interest may be essential in order to compensate the plaintiff or to avoid unjust enrichment of the defendant. For instance, a plaintiff who was unlawfully deprived of the use of $20,000 in 1976, and who did not receive a judgment until 1979, could have obtained $4,500 in the three-year intervening period by investing the money at 7 percent compounded interest.

S.Rep. No. 275, 97th Cong.2d Sess. 30 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News pp. 11, 40 (discussing Section

302 of the Federal Courts Improvement Act of 1982, P.L. 97–164, 96 Stat. 25).

Without denying to the trial court judge discretion in the matter, the Sixth Circuit Court of Appeals has indicated in dicta that it also favors the adoption of the rate set forth in § 1961(a): "Undoubtedly in the future, district courts may be influenced by the congressional wisdom expressed in the amendment of 28 U.S.C. § 1961(a)." *EEOC v. Wooster,* 727 F.2d at 579. Acting on this statement, another bankruptcy court in this circuit has recently adopted the statutorily mandated postjudgment interest rate in its computation of prejudgment interest. *United American Financial Corporation v. Knoxville Properties, Inc. (In re United American Financial Corporation),* 55 B.R. 117, 120 (Bankr.E.D. Tenn.1985).

■ This court determines that the adoption of the interest rate established under 28 U.S.C. § 1961(a) in preference actions based on 11 U.S.C. § 547, by recognizing the fluctuating interest rates in our economy, not only fairly compensates the prevailing litigants, but provides uniformity of treatment in judgments, and orders its award in this case.

## IV. HOLDING

The transfer by the check dated August 7, 1981, from the plaintiff to the defendant having been found to be preferential under 11 U.S.C. § 547(b) and not falling within the exceptions provided 11 U.S.C. § 547(c)(1) or (c)(2), is hereby AVOIDED. The defendant is ORDERED to pay to the plaintiff $845.87, plus interest, in accordance with 28 U.S.C. § 1961(a), from August 10, 1983, the date the complaint was filed, together with the cost of the filing fee for this adversary proceeding.

In order to recognize the effect of this decision on the interests of the defendant, Broadway Sand & Gravel is granted thirty (30) days from the date of this decision to file an original or amended proof of claim in this case.